# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| BLACK VOTER'S MATTER FUND, TRANSFORMATIVE JUSTICE COALITION, THE RAINBOW PUSH COALITION | ] ] ] ] ] | |
| Plaintiffs | ] ] ] | Civil Action No. 20-cv-4869 |
| V. | ] ] ] | |
| BRAD RAFFENSPERGER, Secretary of State of Georgia in his official capacity, | ] ] ] | |
| Defendant | ] | |

# MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION RESTORING WRONGLY REMOVED REGISTRANTS TO THE VOTING ROLLS

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES..................................................................................i

STATEMENT OF FACTS..................................................................................1

ARGUMENT.......................................................................................................4

Introduction........................................................................................................4

I.  Plaintiffs Have Standing to Bring this Action.............................................5

II.  Plaintiffs Have Complied with the NVRA Notice Requirement..............11

III.  Plaintiffs Are Likely to Succeed on the Merits of Their NVRA Claims...12

    A. Defendants Failure to Use a USPS licensee is Directly Responsible
       for Errors in NCOA- Based Removals...................................................12

    B. The Failure to Use A USPS Licensee Also Led to Errors
       in the Defendant's Cancellation of Registrations for Reasons
       of "Returned Mail" and "Use it or Lose It"..........................................14

    C. Plaintiffs Have a Likelihood of Success on Their Claim that the
       Defendant's Actions Violate the NVRA's Requirement for the
       State to Have Accurate and Current Voter Rolls................................17

    D. Plaintiffs Have a Likelihood of Success on Their As Applied
       Challenge to "Use it or Lose it" Under the Equal Protection Clause
       of the 14th Amendment........................................................................18

IV.  Plaintiffs' Will Suffer Irreparable Harm Absent Injunctive Relief........21

V.  Plaintiffs Claim To Relief Outweighs Harm to the Defendant and the
    Relief is in the Public Interest..................................................................23

# TABLE OF AUTHORITIES

## CASES

*Arcia v. Sec'y of State of Fla.,* 772 F.3d 1335 (11th Cir. 2014)................................6

*Black Voters Matter Fund v. Raffensperger,* No. 1:20-cv-01489-AT, 2020 U.S. Dist. LEXIS 143209 (N.D. Ga. Aug. 11, 2020)....................................................6, 8

*Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006).....................25

*Democratic Party of Ga., Inc. v. Crittenden*, 347 F. Supp. 3d 1324, 1346 (N.D. Ga. 2018)........................................................................................................................25

*Dunn v. Blumstein*, 405 U.S. 330, 335-36, 92 S. Ct. 995, 999 (1972)...................22

*Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976).........24

*Fair Fight Action Inc. v. Raffensperger*, 413 F. Supp. 3d 1251, 1266 (N.D. Ga. 2019)..........................................................................................................6, 16, 23, 26

*GeorgiaCarry.org v. U.S. Army Corps* 788 F.3d 1318, 1322 (11th Cir. 2015)........4

*Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379, 102 S. Ct. 1114, 71 L. Ed. 2d 214 (1982)...................................................................................................................5, 6

*League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014)................................................................................................................25

*Levi Strauss & Co. v. Sunrise Int'l Trading Inc.,* 51 F.3d 982, 985 (11th Cir. 1995)...........................................................................................................................4

*Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012)..............................24

*Parker v. State Bd. of Pardons and Paroles,* 275 F.3d 1032, 1034–35 (11th Cir. 2001)...........................................................................................................................4

*Preston v. Thompson*, 589 F.2d 300, 303 n.4 (7th Cir. 1978)................................24

*Warth v. Seldin*, 422 U.S. 490, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975).................9

*Williams* v. *Rhodes*, 393 U.S. 23, 30 (1968)..........................................................23

*Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986).........................................25

*Yick Wo v. Hopkins*, 118 U.S. 356, 369-73, 6 S. Ct. 1064, 1070-72 (1886).....21, 22

## STATEMENT OF FACTS

Plaintiffs have brought this case to restore to the voter rolls almost 200,000 citizens of Georgia who wrongfully had their registrations cancelled based on the Secretary of State's determination that they had moved their residence when they had not.

As noted from the Complaint, and stated below, the Secretary of State's office engages in a program which is ostensibly designed to make the voter rolls more current and more accurate. However, the Secretary of State failed to use a United States Postal Service (hereafter "USPS") licensee to check the National Change of Address Registry (hereafter "NCOA") in violation of the National Voter Registration Act (hereafter "NVRA"). Based on the findings stated below, the Secretary of State's office, by the actions alleged in the complaint, appears to have removed almost 200,000 citizens who should not have been removed.

The record of 2019 cancellations showed that 313,243 citizens of Georgia had been removed from the voter rolls, based on a claim that they had changed their residency. The list of removed voters are identified by the reason for the removal of each voter as follows: NCOA, "returned mail," or "no contact/no vote" for two election cycles. Despite the reason for the removal, all registrants at issue were removed based on the claim that they had moved from their residence. Specifically, 108,306 registrations were cancelled allegedly for providing data to the NCOA

registry. An additional 84,376 registrations were cancelled based on alleged "returned mail." Another 120,561 registrations were cancelled based on "no contact/no vote" for 2 elections cycles, often referred to as the "use it or lose it" provision of the law. After Mr. Lenser, an expert in the direct mail address verification industry was hired by the Palast Investigative Fund (hereafter "PIF" or "Palast Investigative Fund"), he processed these lists through Merkle Inc., a USPS full-service licensee of NCOA address changes (with 48 months of change filings) using advanced list hygiene capability. After analyzing the list of 108,306 voters which Defendant identified as having their registrations cancelled by reason of their names being on the NCOA lists, Merkle found 68,930 citizens still had mailable addresses where their registration records said they lived.

Due to this rather surprising result, Mr. Lenser sent the file of 68,930 registrations to a second USPS full-service licensee, InfoUSA, for NCOA processing. InfoUSA confirmed the accuracy of Merkle's processing, finding only 118 additional NCOA move records in the file. This small number of additional move records probably resulted from the elapsed time between the two times the list was processed. Therefore, substantially 68,812 voters were removed from the voter rolls for allegedly having submitted change of address notices to the post office when they had not done so, and they still had mailable addresses at the place of their

original registrations.  These people were therefore, wrongly removed from the voter rolls.

After subjecting the list of 84,376 voters identified as the "returned mail" group  to the list hygiene process at Merkle Inc., it was found that 51,785 persons had mailable addresses where their registration records said they had lived. Therefore, another 51,785 voters were wrongly removed from the voter rolls. After subjecting the list of 120,561 voters identified as having "no contact /no vote" for two election cycles to the list hygiene process at Merkle Inc., it was found that 79,193 had mailable addresses where their registration records said they still lived. Therefore, another 79,193 voters were wrongly removed from the voter rolls. Based on the above analysis, in total 199,908 Georgians had their registrations cancelled for allegedly moving when, according to experts in the field, in all likelihood they had not. (See Declaration of John Lenser attached as Exhibit A)

There is a run-off election for two Senate seats in Georgia which could determine the control of the U.S. Senate on January 5, 2020. On December 7, 2020 registration for this election closes. Plaintiffs bring this case on behalf of the Georgia citizens who were wrongly removed from the voter rolls for having moved when the evidence shows they did not move.

Because of the importance of this election, it is not speculation that people who may have been infrequent voters and were subject to removal from the voter

3

rolls will find this election consequential enough to want to vote. But because they likely never received any or adequate notice of their cancellation, they will be disenfranchised if they attempt to get an absentee ballot or show up at the polls for early or day of voting. This is precisely the reason Plaintiffs are therefore, seeking emergency injunctive relief to restore people to the rolls.

## ARGUMENT

**Introduction:**

In order to obtain the injunctive relief requested in Plaintiffs' Complaint, pursuant to Federal Rule of Civil Procedure 65, Plaintiff's must show (1) they have a substantial likelihood of success on the merits of the Complaint; (2) they will suffer irreparable injury absent injunctive relief; (3) their injury outweighs the harm the injunction would cause to the non-movant; and (4) the injunction is in the public interest. *GeorgiaCarry.org v. U.S. Army Corps* 788 F.3d 1318, 1322 (11th Cir. 2015); *Parker v. State Bd. of Pardons and Paroles,* 275 F.3d 1032, 1034–35 (11th Cir. 2001). The burden is on the movant to establish each of these factors. Notwithstanding this burden, at the stage of the preliminary injunction, a district court may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is "appropriate given the character and objectives of the injunctive proceeding." *Levi Strauss & Co. v. Sunrise*

*Int'l Trading Inc.,* 51 F.3d 982, 985 (11th Cir. 1995). Plaintiffs address each factor below.

## I.  Plaintiffs Have Standing to Bring this Action

Plaintiff's recognize that in order for the Court to exercise jurisdiction over this case the Court must find that the Plaintiffs have standing to raise the issues herein. It is well established that an organization can establish standing to sue on its own behalf where it can show the defendant's acts resulted in an impediment to the organization's mission or diversion of its resources. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379, 102 S. Ct. 1114, 71 L. Ed. 2d 214 (1982) (holding that an organization has standing to sue on its own behalf if the defendant's illegal acts impair its ability to engage in its projects by forcing the organization to divert resources to counteract those illegal acts).

The Plaintiffs in this case are all organizations which have civic engagement as well as voter education, registration and support for voting rights as aspects of their missions. Each has claimed that they have been required to divert resources from their overall voting rights work in order to ensure that persons who were wrongly removed from the voter rolls—and do not know it—are allowed to vote and will be able to vote in the upcoming run-off election for two Senators from Georgia.

With respect to organizational standing, the Court in *Fair Fight Action Inc. v. Raffensperger*, 413 F. Supp. 3d 1251, 1266 (N.D.Ga. 2019) stated:

> Organizations, like individuals, can establish standing to sue. *Arcia v. Sec'y of State of Fla.,* 772 F.3d 1335 at 1341-42 (describing two different theories under which an organization can demonstrate standing—diversion-of-resources and associational). In the instant case, Plaintiffs assert standing under the diversion-of-resources theory. See Doc. No. [41], ¶¶ 10-35. "Under the diversion of resources theory, an organization has standing to sue when a defendant's illegal acts impair the organization's ability to engage in its own projects by forcing the organization to divert resources in response." *Arcia*, 772 F.3d at 1341.

The Court found that the organizations which sued the Secretary of State et. al. in the *Fair Fight Action* case had standing to challenge an array of what they alleged were laws which were suppressive of the vote. The Court further found that:

> Even though Plaintiffs all have promoting voting and voter education as part of their missions, they each allege [**18] that they have had to, or will have to, redistribute resources from existing programs to ones specifically designed to address Defendants' challenged practices. *Fair Fight Action, Inc. v. Raffensperger,* 413 F. Supp. 3d 1251, 1267 (N.D. Ga. 2019)

In a similar vein, the Court in *Black Voters Matter Fund v. Raffensperger,* No. 1:20-cv-01489-AT, 2020 U.S. Dist. LEXIS 143209, at *14-17 (N.D. Ga. Aug. 11, 2020) stated:

> It is not required that a plaintiff-organization be forced to completely cease an activity to establish standing, as Defendants argue, rather it is enough for the organization to demonstrate that such activities have been substantially curtailed [*52] or significantly impacted by the challenged action. *See Havens Realty Corp. v. Coleman*, 455 U.S. at 379 ("If, as broadly

alleged, petitioners' steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low-and moderate-income home seekers, there can be no question that the organization has suffered injury in fact. Such concrete and demonstrable injury to the organization's activities - with the consequent drain on the organization's resources - constitutes far more than simply a setback to the organization's abstract social interests.");

In this complaint, Plaintiff Black Voters Matter Fund (hereafter "BVMF") has identified itself as a non-partisan civic organization whose goal is to increase power primarily in communities of color. Effective voting allows a community to determine its own destiny. BVMF seeks to promote the rights specifically of communities of color to determine their own destiny. Historically and currently, communities of color often face barriers to voting that other communities do not, so Plaintiff focuses on removing those barriers to voting. BFMV's core programs are increasing voter registration and turnout, advocating for policies to expand voting rights and access. BFMV has been very concerned about the efforts made over the years by the State of Georgia to cancel the registrations of Georgia's citizens. Under the systems in place, if the Secretary of State cancels the registration of voters based on a claim that they have moved, when they did not, these voters do not find out of their removals from the voter rolls until they attempt to vote. BVMF leaders became aware of the report issued by the ACLU of Georgia when it was publicly released on September 1, 2020, based on the work of the Palast Investigative Fund which presented evidence that almost 200,000 citizens of Georgia had their registrations

cancelled for having moved when the evidence did not support any change of address.

As a result of BVMF's concern that these voters were wrongfully removed, BVMF diverted $44,206 from their other programs of voter education, voter registration and support for eliminating barriers to voting by sending written communications to 95,656 people on the list provided by the Palast Investigative Fund as not having moved, advising them that their registrations had been cancelled and of their rights to re-register. Had the Secretary of State followed the law to use a licensee of the United States Post Office to check the NCOA registry, BVMF would not have had to divert scarce resources away from the organization's core programs so as to ensure persons wrongly removed from the voters have a chance to vote. BVMF has had to continue to reach out to these people and, absent the relief requested here, BVMF will have to spend further resources on trying to reach people who do not know their registrations have been cancelled and help them re-register before the December 7, 2020 deadline.

The BVMF has been recognized to have standing in a case challenging another aspect of obstacles to voting in *Black Voters Matter Fund v. Raffensperger,* No. 1:20-cv-01489-AT, 2020 U.S. Dist. LEXIS 143209, at *14-17 (N.D. Ga. Aug. 11, 2020). In that case, Cliff Albright, co-founder and Executive Director of BVMF, filed two declarations which the Court found sufficient for establishing

organizational standing. In that case, which challenged the requirement that voters pay the postage for mail in ballots, Mr. Albright explained the reasons why BVMF had to divert resources to providing money for postage to voters through their partner organizations. (See 1:20-cv-01489, Dks 2-2 and 77). Based on the allegations therein and in this case, the law supports a finding that BVMF has standing to bring this case.[1]

The Transformative Justice Coalition (hereafter "TJC") has stated a similar diversion of resources as the basis for standing. TJC is a non-partisan 501(c)(3) organization which seeks to be a catalyst for transformative institutional changes to bring about justice and equality in the United States and abroad. One of TJC's programs is called the Democracy and Voting Rights Project. Through this project, TJC has been involved in voter education as well promoting voting rights through informing the public about threats to democracy in the United States, how to protect their voting rights and steps to take to ensure their ability to cast a ballot and have it counted. TJC has been working toward advancing electoral reforms including seeking the restoration of voting rights for ex-felons. TJC leaders and allies have been working in Georgia for a number of years doing this work and continue to work

---

[1] In ruling on a motion to dismiss for lack of standing, the court must accept as true all material allegations of the complaint and construe them in the Plaintiffs' favor. *Warth v Seldin*, 422 U.S. at 501-02 (citations omitted). At the same time, it is within the court's power to consider by affidavits [*42]

in Georgia. TJC leaders became aware of the ACLU of Georgia's report on the data of the experts working with the Palast Investigative Fund regarding the cancellations of registrations of almost 200,000 people. TJC is aware that one of the sources of the removals was the Secretary of State's use of a NCOA list which was not provided by a licensee of the USPS. TJC has, therefore, had to divert resources from some of its campaigns to try to find those wrongfully removed from the voter rolls to try to get them re-registered. TJC would not have had to do this had the Secretary of State used a licensee of the USPS and/or agreed to meet with the experts with the Palast Investigative Fund.

The Rainbow Push Coalition (RPC) has a long history of fighting for social change. RPC is a multi-racial, multi-issue, progressive, international membership organization fighting formed in December 1996 by Reverend Jesse L. Jackson, Sr. through the merging of two organizations he founded earlier, People United to Serve Humanity (PUSH, 1971) and the Rainbow Coalition (1984). RPCs mission is to protect, defend, and gain civil rights by leveling the economic and educational playing fields, and to promote peace and justice around the world.  For the past 20 years the Peachtree Street Project has been the Southeastern Regional initiative of the Citizenship Education Fund (CEF) which is the programmatic arm of RPC.  The mission of CEF is to educate voters and promote full participation in the electoral process the organization also seeks to empower citizenry through the effective use of public policy

advocacy. Pursuant to such, the Peachtree Street Project has invested heavily in voter registration, voter education, voter mobilization and civic engagement.  During the 2018 and 2020 election cycles, the Peachtree Street Project traveled to all 159 counties in the state of Georgia to register voters.  Additionally, during their annual "Creating Opportunity Conference" have hosted panels including the nation's leading experts on voting rights.  Finally, the Peachtree Street Project of RPC has worked heavily on media messaging and saturation intended to ensure that the maximum number of Georgians are educated on electoral issues.  The actions of the Georgia Secretary of State in purging and disenfranchising hundreds of thousands of voters have caused injury to this organization by effectively nullifying decades of work in voter engagement and mobilization requiring RPC to divert resources to ensuring registrants can remain on the voter rolls.

All of the Plaintiff organizations have standing to raise the issues in this case.

## II. Plaintiffs have Complied with the NVRA Notice Requirement

The National Voter Registration Act provides for a private right of action 90 days after the chief election officer receives notice of a possible violation. (52 U.S.C.S. § 20510(b)(1)). In this case, the report of the Palast Investigative Fund issued by the ACLU of Georgia on September 1, 2020 put the Defendant on notice of the alleged violations of the NVRA, in particular the alleged failure of the Secretary of State to use a USPS licensee in order to check the NCOA registry, which violated the NVRA.

The report also alleged that of the 313,243 registrations which had been cancelled for either death or change of residence, over 199,908 had not changed their residence, which is a violation of the NVRA's requirement not to remove people from the rolls unless they have moved or died.

After the September 1, 2020 notice, Counsel for the Palast Investigative Fund sent two letters—one on September 22, 2020 and the next on October 19, 2020—to the Secretary of State advising him of these violations and asking for a meeting of experts to address why the Secretary of State's lists diverged so greatly from the lists of voters analyzed by a company which is a USPS licensee (and uses other advanced list hygiene methods) and who found that 199,908 of the 313,243 citizens removed from the voter rolls had likely never moved. These people were therefore likely wrongly removed from the voter rolls based on the theory that they had changed their residence. The Defendant failed to respond to any of these requests to meet. The filing of this case on December 2, 2020 gave the Defendant the 90-day notice of these violations before filing.

## III. Plaintiffs are likely to Succeed on the Merits of their NVRA Claims.

### A. Defendants Failure to Use a USPS Licensee Is Directly Responsible for Errors in NCOA-Based Removals

The NVRA allows states to engage in a general program of removing persons ineligible to vote from the voter rolls, but 52 USCS § 20507 (a)(4) (A) and (B) limit this program to removal of persons who are ineligible by reason of death or change

of residence. Under 52 USC §20507 (c) one way that a State may meet the requirement of subsection (a)(4) in removals for change of address is by establishing a program under which the State uses "change-of-address information supplied by the Postal Service through its licensees" who can "identify registrants whose addresses may have changed." This change of address information is derived from the National Change of Address registry, or the NCOA list. The State of Georgia claims to have utilized the NCOA list for purposes of determining who has moved so as to cancel their registrations. As noted in the Complaint, Defendant identified 108,306 registrants who had their registrations cancelled with the reason being "NCOA."

The Palast Investigative Fund asked expert John Lenser to review the November 2019 lists of those persons removed from the voting rolls by the Secretary of State. As noted in the Complaint, and the record in *Fair Fight Action Inc. v Raffensperger*, the Georgia Secretary of State used Total Data Technologies for identifying the people on the NCOA list.  Total Data Technologies is not a USPS licensee. When Mr. Lenser submitted the Secretary of State's list of 108,306 names alleged to be in the NCOA registry to a full-service USPS NCOA licensee Merkle Inc., more than half of the 108,306 or 68,930 Georgians removed from the rolls were found not to have filed NCOA notices in the prior 48-months. This finding, plus further "list hygiene" analysis, showed that these 68,930 citizens still had

mailable addresses at the residence they claimed at the time they initially registered to vote. Because Mr. Lenser was so surprised by this result, he approached another USPS full-service licensee, InfoUSA Group, to confirm that these 68,930 were not present in the NCOA database. InfoUSA confirmed the Merkle results.

Clearly the Defendant violated the NVRA by failing to use a USPS licensee to identify those registrants taken off the voter rolls by virtue of their name being on the NCOA list. Plaintiffs assert that the fact that there were so many people whose names were not on the NCOA list when the Defendant claimed they were can be explained by the failure of the Defendant to use a USPS licensee to check the lists. Plaintiffs clearly have a substantial likelihood of success on the merits of this claim, as Defendant failed to follow the requirements of the NVRA.

**B. The Failure to Use A USPS Licensee Also Led to Errors in the Defendant's Cancellation of Registrations for Reasons of "Returned Mail" and "Use It or Lose It"**

As noted in the complaint, there is a history in Georgia of cancelling the registrations of persons the Secretary of State deems to have moved, when the evidence is to the contrary. The 534,517 voters removed from the voter rolls in 2017 under "use it or lose it" was shown to be 64 percent inaccurate based on the list hygiene results. This pattern continued in 2019 where Defendant identified 84,376 citizens as being removed from the voter rolls, based on "returned mail." This group was not immediately made inactive but put into the category of those who did not

have contact with the elections offices for three years and were sent a confirmation postcard. When that postcard was not returned, the registrant was considered inactive and subject to removal following the second general election in which the person did not vote. Again, as noted in the Complaint, 120,561 Georgia citizens were identified by Defendant as being removed from the voter rolls for "no contact/no vote" for two elections. These are the persons removed under the "use it or lose it" sections of the Georgia law O.C.G.A §§ 21-2-234 and 21-2-235

This provision of Georgia's law is based on a similar provision in the NVRA. The difference between them is that the NVRA is silent on what information has to come to the attention of elections officials concerning whether a voter has moved before a confirmation postcard as described in 52 USC 20507 (d) is sent. The only requirements for voter list maintenance activities in the NVRA is that they must be uniform, non-discriminatory, not in violation of the Voting Rights Act, and not based on the failure of the registrant to vote. 52 USC 20207 (b) (1) & (2). The NVRA, like Georgia, does allow for the cancellation of registrations after the registrant has not returned the confirmation postcard and not voted in the next two general federal elections after the notice.

As noted, Georgia used "no contact" with elections or elections officials for three years and receiving "returned mail" as a basis for sending the confirmation postcard.

Nonetheless, Mr. Lenser then provided both the "returned mail" and "no contact/no vote" for two elections lists to Merkle Inc. for analysis. As noted, Merkle Inc., a full-service NCOA licensee of the United States Postal Service, provides advanced address hygiene technology as a service to the direct marketing industry. The service is used by many direct retailers on a routine basis to ensure that their mail is deliverable and sent to the current address of their customers and prospects. The application of this technology virtually eliminates undelivered mail, either updating the address or suppressing those addresses that cannot be resolved. It identifies significantly more change of addresses than can be identified through NCOA although NCOA is one component of Merkle Inc.'s processing. In excess of two hundred data sources (such as internet retailers, subscription providers, and financial companies) feed current address information or change of addresses weekly to Merkle Inc.'s consumer "knowledgebase" consisting of over 240 million individuals for whom there are multiple contributing sources that corroborate the identity and present location of each individual. The lists submitted by mailers, or in this case, the list from the Secretary of State, are then compared to the master knowledgebase list to confirm the submitted address as current, provide a new address, or designate an address as unverifiable.

The results of Merkle's analysis showed 51,785 from the "returned mail" group and 79,193 of the "use it or lose it" group still had mailable addresses at the place

where they originally registered from. The result is that of the 313,243 Georgians who had their registrations cancelled for changing residence, almost two thirds of them did not move.

The Defendant's failure to use a USPS licensee, such as Merkle Inc. or InfoGroup, for the NCOA evaluation clearly had an adverse result in mistakenly identifying many voters as having moved with NCOA as the reason for cancellation of their registrations. An equally adverse result could have been avoided for those eliminated for the reason "returned mail" or "no contact" in that the use of advanced list hygiene provided by Merkle Inc. or several other full-service NCOA licensees could have verified that many of these voters continued to reside at their address of registration. In light of this the Defendant's violation of the NVRA by not using an USPS licensee for the NCOA had a carry-over effect on the persons removed from the rolls for reasons of "returned mail" and "no contact." Plaintiffs thus have a likelihood of success on the merits of their claim that the Defendant's violation of the NVRA in using a non-USPS licensee contributed to errors in all of the lists under which Defendant claimed the voters changed their residences when they did not.

> **C.  Plaintiffs have a Likelihood of Success on Their Claim that the Defendant's Actions Violate the NVRA's Requirement for the State to Have Accurate and Current Voter Rolls.**

52 USCS § 20501 (4) states one of the purposes of the NVRA is to ensure that accurate and current voter registration rolls are maintained. Based on the work of the experts who evaluated the lists of cancelled registrations, it was determined that 199,908 still have mailable addresses at their address of registration so they have not likely moved. The effect of the removal of so many registrants based on having moved when the evidence is to the contrary is to make the voter registration rolls less current and less accurate in violation of one of the main purposes of the NVRA.

Therefore, Plaintiffs have a likelihood of success on the merits of this claim

### D. Plaintiffs Have a Likelihood of Success on Their As Applied Challenge to "Use It or Lose It" Under the Equal Protection Clause of the 14th Amendment

With the evidence that so many of the people whose registrations were cancelled under Georgia's "use it or lose it" law had not moved, the presumption that these infrequent voters must have changed their residence is undermined. The NVRA allows removal of voters from voter rolls if they die or change their residence. Since the outset, the State of Georgia has been using infrequent contact and infrequent voting as proof of changing residence. The evaluation by the expert and the information obtained through his work with list hygiene companies shows that this is not true. Given this evidence there is no basis to believe that frequent voters change their residence more or less often than the infrequent voters who are the

targeted class under "use it or lose it." Yet the infrequent voters are treated differently.

In the seminal case of *Yick Wo v. Hopkins*, 118 U.S. 356, 369-73, 6 S. Ct. 1064, 1070-72 (1886) the Court stated:

> The right to vote … is regarded as a fundamental political right, because [it is] preservative of all rights.

Although the right to vote was not at issue in *Yick Wo*, the Court addressed the very essence of equal protection of the law. The Court stated:

> … where the constitution has conferred a political right or privilege, and where the constitution has not particularly designated the manner in which that right is to be exercised, it is clearly within the just and constitutional limits of the legislative power, **to adopt any reasonable and uniform regulations, in regard to the time and mode of exercising that right, which are designed to secure and facilitate the exercise of such right, in a prompt, orderly, and convenient manner;" nevertheless, "such a construction would afford no warrant for such an exercise of legislative power, as, under the pretense and color of regulating, should subvert or injuriously restrain the right itself.**

The lesson of *Yick Wo* is that laws which subvert or injuriously restrain the right at issue deny equal protection of the law. This case is very instructive for Plaintiffs' equal protection claim herein. The NVRA should be facilitating the exercise of the fundamental right to vote of infrequent voters, but, under Georgia's "use it or lose it" law, they are presumed to have changed their residence, and thus deemed removable from the voter rolls for having moved when the evidence does not support this at all.

In *Dunn v. Blumstein*, 405 U.S. 330, 335-36, 92 S. Ct. 995, 999 (1972), the Supreme Court was asked to determine the constitutionality of a residency requirement for registering to vote under an equal protection analysis. The Court stated:

> To decide whether a law violates the Equal Protection Clause, we look, in essence, to three things: the character of the classification in question; the individual interests affected by the classification; and the governmental interests asserted in support of the classification. Cf. *Williams* v. *Rhodes*, 393 U.S. 23, 30 (1968). In considering laws challenged under the Equal Protection Clause, this Court has evolved more than one test, depending upon the interest affected or the classification involved. First, then, we must determine what standard of review is appropriate. In the present case, whether we look to the benefit withheld by the classification (the opportunity to **vote**) or the basis for the classification (recent interstate travel) we conclude that the State must show a substantial and compelling reason for imposing durational residence requirements.

In this case, the character of the classification under Georgia's "use it or lose it" law is frequency of voting. The individual interest affected by the classification between frequent and infrequent voters is the fundamental right to vote. The governmental interest is to make sure that the voter rolls are accurate and current. Plaintiffs assert that under these circumstances the level of scrutiny that should be given to the potential loss of the fundamental right to vote is strict scrutiny. In order for Georgia's "use it or lose it" law to survive strict scrutiny there must be a compelling State interest. As noted above and as stated by the Defendant to the Court in the *Fair Fight Action* case, when the plaintiffs there sought to enjoin the removal

of those being removed for "no contact," the main interest the State sought to assert was the obligation to update the voter rolls to be more accurate. **But, as applied in Georgia, this reason cannot be compelling when the evidence shows the use of the law to remove infrequent voters makes the voter rolls less accurate by virtue of removing people from the rolls who did not move, where the NVRA allows removals for change of residence and death.**

**In light of the foregoing, Plaintiffs have a likelihood of success on the merits of their as applied equal protection challenge to "use it or lose it."**

## IV. Plaintiffs' Will Suffer Irreparable Harm Absent Injunctive Relief

At issue in this case is the disenfranchisement of almost 200,000 Georgia citizens who had been registered to vote but whose registrations were cancelled based on a flawed belief that these citizens changed their residence. Absent injunctive relief, these potential voters will lose their ability to vote in the upcoming run-off election.

In *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012), the Court noted that if constitutional rights are threatened or impaired, irreparable injury is presumed.  ("**A restriction on    the fundamental right to vote    constitutes irreparable injury**.")  This concept has been recognized in numerous cases. *See Preston v. Thompson*, 589 F.2d 300, 303 n.4 (7th Cir. 1978) ("The existence of

a   continuing   constitutional   violation **constitutes** proof   of an **irreparable** harm."); *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976) (where plaintiff had proven a probability of success on the merits, the   threatened   loss   of   First   Amendment   freedoms unquestionably **constitutes irreparable injury**"); *Williams v. Salerno*, 792 F.2d 323,   326   (2d   Cir.   1986)   (holding   that   plaintiffs   "would   certainly suffer **irreparable** harm   if   their **right** to **vote** were   impinged   upon"). Further, infringement   on   a   citizens'   constitutional **right** to **vote** cannot   be   redressed by money damages, and therefore traditional legal remedies would be inadequate in this case. *See Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006) ("The   loss   of   First   Amendment   freedoms   is   presumed to **constitute** an **irreparable injury** for   which   money   damages   are   not adequate."); *League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) ("[O]nce the election occurs, there can be no do-over and no redress."). Accordingly, at least to the extent that they have demonstrated a likely constitutional violation as discussed below, Plaintiffs have satisfied the first two prongs of the initial showing—**irreparable** harm and inadequate remedies at law. *Democratic Party of Ga., Inc. v. Crittenden*, 347 F. Supp. 3d 1324, 1346 (N.D. Ga. 2018) ("[T]the disenfranchisement of the right to vote is an irreparable injury and one that cannot easily be redressed.").

In light of this precedent, the Plaintiffs have shown that absent the relief requested, they will suffer irreparable harm.

## V.  **Plaintiffs Claim To Relief Outweighs Harm to the Defendant and the Relief is in the Public Interest**

The last factors to be considered by the Court in addressing the relief of restoration to the voting rolls of persons whose registrations were wrongly cancelled is whether the harm to the Defendant outweighs the wrong suffered by the Plaintiffs and whether the relief requested is in the public interest.

The wrong suffered by those the Plaintiffs represent is the loss of their fundamental right to vote. The Defendant is on record in the *Fair Fight Action* case that persons can be put back on the rolls very easily, so that administrative inconvenience should not be an issue.

There is no partisan issue here. As stated by Mr. Lenser, the list hygiene companies are commercial enterprises whose role is to provide a service to businesses who need to know the current addresses of their customers. Merkle Inc. and others who reviewed the Secretary of State's data did not know the reasons Mr. Lenser asked them to evaluate it.

The public has an interest in allowing as many people who are eligible to vote to cast their ballots, especially in a critical election as will occur on January 5, 2021.

As noted in the Complaint, it is not known how many people have been alerted by Plaintiffs or other outreach groups in order to know whether or not there are still almost 200,000 people wrongly removed. However, there is no public interest in denying these registrants the right to vote when they have been wrongly removed for having moved when they did not.

The Court has the power to grant this relief or some similar relief such as appointing a special master, or expert to review the information the Secretary of State previously refused to review in September and October, and make the call as to whether the evidence Plaintiffs have presented supports the relief requested.

For the foregoing reasons, Plaintiffs request the Court grant the injunctive relief requested.

Respectfully submitted this 2nd day of December 2020,


_____/s/_____
**Gerald A. Griggs**
Ga. Bar 141643
Attorney for Plaintiffs


1550 Scott Blvd
Decatur, Ga. 30030
(404) 633-6590
Gerald@geraldagriggs.com


_____/s/_____
Jeanne Mirer

24

NY Bar # 4546677
Attorney for Plaintiffs
Pro Hac Vice Application forthcoming

Mirer, Mazzocchi & Julien PLLC
1 Whitehall Street, 16th Floor
York, NY 10004
(212)  231 2235