# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | | |
|---|---|---|
| BLACK VOTERS MATTER FUND, TRANSFORMATIVE JUSTICE COALITION, THE RAINBOW PUSH COALITION and SOUTHWEST VOTER EDUCATION PROJECT | ] ] ] ] ] ] | |
| Plaintiffs | ] ] | Civil Action No. 20-cv-4869 |
| V. | ] ] ] | FIRST AMENDED COMPLAINT |
| BRAD RAFFENSPERGER, Secretary of State of Georgia in his official capacity, | ] ] ] | |
| Defendant | ] | |

## FIRST AMENDED COMPLAINT

### Preliminary Statement – Nature of the Case

Plaintiffs Black Voters Matters Fund, Transformative Justice Coalition, the Rainbow Push Coalition, and Southwest Voter Registration Education Project, by and through counsel, respectfully file this Complaint for Injunctive Relief to address what has been repeatedly brought to the attention of the Secretary of State as the wrongful cancellation of the registrations of almost 200,000 Georgia residents based on the baseless claim that these voters had moved.

As stated more specifically below, the State of Georgia, in violation of the clear strictures of the National Voter Registration Act (hereinafter "NVRA") failed to use a **United States Postal Service (hereinafter "USPS") licensee** in determining that a voter had filed a change of address form with the National Change of Address registry. This error, as noted below, cost over 68,000 people their right to vote. In addition, more than 130,000 other Georgians were also removed from the voter rolls based on provably incorrect information. It is imperative that the State of Georgia take steps to ensure that the voter rolls are accurate and citizens who wrongly had their registrations cancelled are restored to the rolls so they may be allowed to vote in the upcoming run-off elections.

This complaint alleges violations of the NVRA and the United States Constitution in several respects:

(1) **Failure to use a USPS licensee for National Change of Address (hereinafter "NCOA") removals In Violation of the NVRA:** 108,306 Georgians had their voter registrations cancelled in 2019 based on information from the NCOA registry. In making such determination, the Secretary of State, however, failed to use a USPS NCOA licensee to confirm the NCOA registry entries, in violation of the NVRA. When a USPS full service NCOA licensee was used to check these same names, **more than half of the 108,306 Georgians removed from the rolls by this flawed process, or fully 68,930**

**Georgia voters, were found not to have filed NCOA notices and with added list hygiene analysis these people still have mailable addresses from where they initially registered. These registrants were processed through a second USPS full service NCOA licensee to further confirm that they were not present on the NCOA database. They have, thus, been wrongfully removed from the voter rolls.**

 (2) **Challenging the Constitutionality of Georgia's Use It Or Lose It Law, As Applied:** An additional 120,561 voters had their registrations cancelled based on Georgia's "use it or lose law," which is presently subject to a constitutional challenge in *Fair Action Inc. v Raffensperger.,* 1:18-cv-5391 (SJ). Under the "use it or lose it," law in effect when these people were removed, the Secretary of State presumes people have moved if they have had (a) no contact with any election official for three years, (b) failed to return a confirmation postcard, and (c) then failed to vote in the next two federal elections, justifying their purge from the rolls. **According the experts in list hygiene, however, fully 79,193 of the 120,561 voters whose registrations were cancelled in 2019 continued to have a verified address to receive mail at their original address of registration.** Thus, Plaintiffs mount an "as applied" constitutional challenge to Georgia's "use it or lose it" law in light of its factual irrationality of presuming infrequent voters have moved, in light

of the impact on the fundamental right to vote. A system which produces false indication of voters having moved in more than half the cases, is an irrational system;

(3) **Returned Mail:** While NVRA does not allow voters to be removed from the voter rolls based on returned mail, according to the "Use it or Lose it" provisions of Georgia Law (OCGA 21-2-234), if the registrant's mail is returned, the registrant is sent a confirmation notice. If the confirmation notice is not returned within 30 days, the registrant is placed on the inactive list and purged. An additional 84,376 voters had their registrations cancelled based on "returned mail," designation. The evidence adduced from experts after subjecting the list to "advanced list hygiene," however, shows that **51,785 of such purged voters still have mailable addresses at their original place of registration making it unlikely they ever moved**. Again, this unreliable and irrational method produced a false indication of voters having moved more than half the time.

Thus, based on the expert analysis of the 2019 data provided by the Secretary of State as to how many Georgia citizens were cut from the voter rolls, Plaintiffs allege

that 199,908[1] wrongfully lost their right to vote based on an incorrect assumption that they had changed their residence.

Given the close margins of the presidential election and the upcoming run offs in Georgia, Plaintiffs seek declaratory and injunctive relief to allow those persons whose registrations were wrongfully cancelled to be placed on the voter rolls in time to vote in the January 5, 2020 Senate runoff races. Alternatively, Plaintiffs seek the appointment of a special master to review the work of the experts and the Secretary of State's list maintenance experts to determine which voters were wrongfully removed from the voter rolls and to restore those who should be reinstated.

## **PARTIES**

---

[1] Plaintiffs do not list all the names in this complaint. The names of all of voters Plaintiffs claim to have been wrongly removed from the voter rolls have been downloaded to a website with the URL of http://webftp.whitehat.com (username PalastFund, password piYvho3e). Plaintiffs are mindful that the results of this analysis were completed shortly after the data was provided by the Secretary of State in 2019 and acknowledge there are many registered voters who have died or moved in the interim. Therefore, the file was reprocessed. The result in September 2020 showed only a minor reduction of those affected: 195,181. Plaintiffs believe the data is reliable for purposes for the violations of the NVRA and the Constitution alleged in this case. Further Plaintiffs are aware from reading the record in *Fair Fight Action Inc. v Raffensperger*, that the Secretary of State admitted that 22,896 of 313,243, were inappropriately placed on the list of registrants whose registrations were cancelled for the reason of no contact (the "use it or lose it" category), and they were restored to the voting rolls. As the names of these people were not identified in the Fair Fight record, Plaintiffs assume that their names may be part of the list of wrongly removed persons identified by the experts in this case.

1.      Plaintiff Black Voters Matter Fund (hereinafter "BVMF") is a non-partisan civic organization whose goal is to increase power in communities of color. Effective voting allows a community to determine its own destiny. BVMF seeks to promote the rights specifically of communities of color to determine their own destiny. Historically and currently, communities of color often face barriers to voting that other communities do not, so BVMF focuses on the removal of those barriers to voting. BVMF's core programs are increasing voter registration and turnout, advocating for policies to expand voting rights and access. BVMF has been very concerned about the efforts made over the years by the State of Georgia to cancel the registrations of Georgia's citizens. Under the systems in place, if the Secretary of State cancels the registration of voters based on a claim that they have moved, when they did not, these voters do not find out of their removals from the voter rolls until they attempt to vote. BVMF leaders became aware of the report issued by the ACLU of Georgia, based on the work of the Palast Investigative Fund (hereinafter "PIF") which presented evidence that almost 200,000 citizens of Georgia had their registrations cancelled for having moved when the evidence did not support this. As a result of BVMF's concern that these voters were wrongfully removed, they diverted resources from their other core programs—such as voter education, voter registration and support for eliminating barriers to voting—in order to have their 501(c)(3) entity (BVM Capacity Building Fund) send 98,000 postcards to those

people on the list provided by the PIF as not having moved, advising them that their registrations had been cancelled and of their rights to re-register. The cost of this was $44,206.00. Had the Secretary of State followed the law and used a licensee of the United States Post Office, BVMF would not have had to divert scarce resources away from the organization's core programs in an effort to ensure persons wrongly removed from the voter rolls would have a chance to vote.

2.     The Transformative Justice Coalition, (hereinafter "TJC") is a non-partisan 501(c)(3) organization which seeks to be a catalyst for transformative institutional changes to bring about justice and equality in the United States and abroad. One of TJC's programs is called the Democracy and Voting Rights Project. Through this project TJC has been involved in voter education as well promoting voting rights through informing the public about threats to democracy in the United States, how to protect their voting rights and steps to take to ensure their ability to cast a ballot and have it counted. TJC has been working toward advancing electoral reforms including seeking the restoration of voting rights for ex-felons. Leaders of TJC have been working in Georgia for a number of years doing this work and continue to work in Georgia. TJC leaders became aware of the ACLU of Georgia's report on the data of the experts working with the PIF regarding the cancellations of registrations of almost 200,000 people. TJC is aware that one of the sources of the removals was the Secretary of State's use of a NCOA list which was not provided by a licensee of the

USPS.  TJC has, therefore, had to divert resources from some of its campaigns to try to find those wrongfully removed from the voter rolls to try to get them re-registered. TJC would not have had to do this had the Secretary of State used a licensee of the USPS and/or agreed to meet with the experts of the PIF.

3.     The Rainbow PUSH Coalition (RPC) is a multi-racial, multi-issue, progressive, international membership organization fighting for social change. The RPC was formed in December 1996 by Reverend Jesse L. Jackson, Sr. through the merger of two organizations he founded earlier: People United to Serve Humanity (PUSH, 1971) and the Rainbow Coalition (1984). RPC's mission is to protect, defend, and gain civil rights by leveling the economic and educational playing fields, and to promote peace and justice around the world.  For the past 20 years the Peachtree Street Project has been the Southeastern Regional initiative of the Citizenship Education Fund (CEF) which is the programmatic arm of RPC. The mission of CEF is to educate voters and promote full participation in the electoral process the organization also seeks to empower citizenry through the effective use of public policy advocacy. Pursuant to such, the Peachtree Street Project has invested heavily in voter registration, voter education, voter mobilization and civic engagement.  During the 2018 and 2020 election cycles, the Peachtree Street Project traveled to all 159 counties in the state of Georgia to register voters.  Additionally, during their annual "Creating Opportunity Conference" they have hosted panels including the nation's leading experts

on voting rights.  Finally, the Peachtree Street Project of RPC has worked heavily on media messaging and saturation intended to ensure that the maximum number of Georgians are educated on electoral issues.  The actions of the Georgia Secretary of State in cancelling the registrations of voters and disenfranchising hundreds of thousands of voters have caused injury to this organization by effectively nullifying decades of work in voter engagement and mobilization requiring a diversion of resources to ensuring registrants can remain on the voter rolls.

4.     Plaintiff Southwest Voter Registration Project (SVREP) is an organization with a long history in assisting voters in education and registration.   Since it opened its doors in 1974, SVREP has registered 2.7 million Latinos, trained 150,000 Latino leaders and won 210 voting rights lawsuits. The late Congressman John Lewis provided technical assistance on how to register to vote communities of color. In 2014, SVREP organized and established seven Voter Registration Steering Committees to expand the Latino electorate in Fulton, Gwinnett, Dekalb, and Cobb. State Assembly member Brenda Lopez Romero at the time served as one of one of leaders for one of the steering committees. She was not an elected official at the time. Moreover, SVREP has trained several leaders during the Latino Academy sessions including several leaders from Georgia at the Florida training session. One of these leaders we trained is GALEO's president Jerry Gonzalez.  SVREP    is currently mobilizing the Georgia Latino vote for the January 5th runoff.  Because

SVREP heard about the ACLU report and has attempted, since the general election, to the attempt to restore voters who were erroneously determined to have moved to the voter rolls. SVREP therefore has diverted resources to also contacting Georgia voters with phone numbers that were purged from the voter rolls with live phone calls and text messages.  Until the December 7 registration cut off  the diversion of resources to contacting these voter included adding to the team of twenty-five (25) Latino leaders to phone banking the universe of voters we contacted during the general election to now contact the list of voters we found were wrongly purged based on the assumption that they had moved.  SVREP asked these Latino voters to register their families online for the runoff election by the deadline. We were also asking them to double check if they are registered to vote and to re-register to vote if not registered. The phone bank and email messages were sent starting November 5th, will continue up to the end of January 5th.  SVREP, 501c3, contacted 52,000 Georgia Latino voters for the general elections for online voter registration and GOTV.  SVREP provided 1,900 meals with our "Feed the Polls" initiative on Election Day to keep voters in line.

5.     Defendant Brad Raffensperger is the Secretary of State Georgia. He was elected in 2018 and presided over the registration cancellations at issue in this case. He is sued in his official capacity as Secretary of State.

## JURISDICTION AND VENUE

6.     This case arises under the National Voter Registration Act 52 U.S.C. §20501 *et. seq*. This Act grants Plaintiffs a private right of action to enforce its provisions under 52 U.S.C. §20510(b).

7.     The Court has subject matter jurisdiction therefore under 28 U.S.C. §1331 and 28 U.S.C. §1343(a).

8.     This case also arises under 42 U.S.C. §1983 as the NVRA may be enforced under the laws of the United States under 42 USC §1983. Plaintiffs also allege violations of their rights under the Fourteenth Amendment to the United States Constitution.

9.     Venue is proper in this District pursuant to 28 U.S.C. §1391 as the actions complained of occurred in this District.

## FACTUAL ALLEGATIONS

**Background Allegations -This is Not the First Time Hundreds of Thousands of Georgians Who Did Not Move had Their Registrations Cancelled.**

10.    In 1993, the United States Congress passed the National Voter Registration Act. 52 U.S.C. § 20501. (NVRA).

11.    This Act was passed based on the following Congressional findings:

> **(1)** the right of citizens of the United States to vote is a fundamental right;
> **(2)** it is the duty of the Federal, State, and local governments to promote the exercise of that right; and

**(3)** discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities.

12.   The purposes of the NVRA act are consistent with these findings and are:

(1) to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office;

(2) to make it possible for Federal, State, and local governments to implement this Act in a manner that enhances the participation of eligible citizens as voters in elections for Federal office;

(3) to protect the integrity of the electoral process; and

(4) to ensure that accurate and current voter registration rolls are maintained.

13. Based on the above Congressional findings and stated the purposes of the NVRA states are required to eliminate barriers to citizens exercising their fundamental right to vote. The NVRA puts affirmative duties on state and local governments to increase the number of eligible voters.

14. Although one purpose of the law is to maintain current and accurate voter registration rolls, the requirements and duties to increase participation and remove barriers have in some cases been subordinated to states' desire to purge their voter rolls of groups or individuals whom those in power do not want to see exercise the franchise.

15.   Rather than promoting voter registration and eliminating unfair discriminatory practices, many States and local governments have embraced voter

roll purging, and allowed voter roll maintenance to eclipse and undermine the ameliorative findings and purposes of the NVRA.

16.     In the process, many states, including Georgia, under the direction of the prior and current Secretaries of State, do not ensure that the voter registration rolls are current or accurate.  In fact, they have cancelled the registrations of people who do not change their residences when such cancellations are prohibited by the NVRA and presumably by Georgia law. This results in the unlawful disenfranchisement of properly registered voters, and thus is a violation of their fundamental rights under the United States Constitution.

17.     While list maintenance procedures are not improper per se, Congress determined that in order to ensure that any list maintenance activities are implemented in a non-discriminatory manner consistent with the purposes and findings of the NVRA, the process of maintenance must be transparent to the public. Specifically, 52 U. S. C. §20507 (i) requires:

> **(1)** Each State shall maintain for at least two years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.

(2) The records maintained pursuant to paragraph (1) shall include lists of the names and addresses of all persons to whom notices described in subsection (d)(2) are sent, and information concerning whether or not each such person has responded to the notice as of the date that inspection of the records is made.

18.     This case arises out of work by experts working with the Palast Investigative Fund (hereafter PIF or Palast Investigative Fund), who sought to verify whether the programs used for list maintenance by the Secretary of State accomplished the ends of ensuring that all eligible Georgia citizens can vote, and that the voter rolls are current and accurate.

19.     Plaintiffs are aware of previous litigation commenced in 2018 by *Greg Palast, and Helen Butler v. Kemp/Raffensperger,* (Civil Action 1:18-CV-04809-ELR) based on the failure of the Secretary of State to provide the plaintiffs therein with the list of people who appeared on the Interstate Voter Crosscheck list.

20.      The Court in that case ruled preliminarily that such lists should have been turned over as part of the public disclosure provisions of the NVRA.

21.     The previous case arose out of an NVRA request for documents from 2016 and 2017.

22.     The response included the 2016 and 2017 registration cancellation lists, and the 2016 and 2017 lists of those voters changed from active to inactive.

23.     The lists of voters whose registrations were cancelled or whose status was changed to inactive was provided. The lists stated the reason for either the cancellation or inactivation. Results of this analysis are depicted in the chart below:

### 2017 Cancellations by Reason

| Status Reason | Removal Process | | | |
|---|---|---|---|---|
| | System | User Action | Vital Process | Grand Total |
| Deceased | - | 24,224 | 40,222 | 64,446 |
| Duplicate | - | 36,623 | - | 36,623 |
| Error | 2 | 281 | - | 283 |
| Felon | - | 14,021 | - | 14,021 |
| Hearing | 31 | 574 | - | 605 |
| Mentally Incompetent | - | 21 | - | 21 |
| Moved Out of County | 22 | 784 | - | 806 |
| Moved Out of State | 10 | 11,621 | - | 11,631 |
| No Activity For 2 Genl Election Cycles | 534,510 | 7 | - | 534,517 |
| Not Verified | 8 | 514 | - | 522 |
| Voter Requested | 1 | 2,201 | - | 2,202 |
| Grand Total | 534,584 | 90,871 | 40,222 | 665,677 |

24.     According to these results over a half a million Georgians had their registrations automatically cancelled due to inactivity for two election cycles.

25.     Under this process, denoted in O.C.G.A. §§ 21-2-234 and 21-2-235, before the later 2019 amendments, voters who had not voted or made contact with any election's offices in the state of Georgia over a period of three years are mailed a notice at the address corresponding to their voter registration information, asking them to confirm within 30 days whether they still live at that address. If elections officials receive no response at the expiration of 30 days, the voter is moved to an "inactive list." If they

failed to make contact with elections officials—either by voting in any election or any other form of contact—over another two general elections, their voter registration was cancelled. In 2017, Georgia automatically cancelled the registrations of 534,517 voters following this process, a number equivalent 1 in 12 Georgia registrants.

26.    The confirmation process described above is based on NVRA's allowance for such registration cancellation, however, a voter cannot be removed solely on the basis of not voting. 52 U.S.C. § 20507(b)(2)

27.     Thus, no contact, failure to return the confirmation postcard and not voting in the next two general elections act as "proxies" for the state presuming a registrant had moved.

28.    To test whether there was truth to this proxy hypothesis, the PIF, which had been the original requestor of the data, decided to determine whether those 534,517 individuals cancelled in 2017 for missing two general elections were indeed no longer living at the address that existed on their original registration.

29.    The PIF hired well known experts to subject the lists of people alleged to have moved, to a process known in the industry as "list hygiene" using companies whose job it is to verify addresses for commercial enterprises who need to ensure they are sending information to the correct addresses of their customers. The team included: (1) John Lenser, CEO of American Fifth Act, then of CohereOne and a mailing address hygiene consultant; and (2) Mark Swedlund, founder of Swedlund Associates, a direct marketing

and mailing consultant. They, in turn, utilized the data analysis and address formatting services of CompuTech Direct, Inc. and the NCOA and advanced address correction services of Merkle, Inc., one of 18 USPS full service NCOA licensees.

30.    The experts received a file of 555,702 voter registration records, which comprised the relevant portions of both the 2016 and 2017 cancelled voter lists originating from the State of Georgia. These records excluded voters cancelled for being deceased, for being convicted felons, those adjudged mentally incompetent, and other standard conditions that disqualify voters.

31.    The experts then read and corrected address fields, parsing them into street address, city, state, and zip code, as the State of Georgia had not provided them in a usable standard address format.

32.    From that process, 458,556 were further processed through postal "hygiene" routines including address standardization, zip code correction, NCOA and Proprietary Change of Address (hereinafter "PCOA") databases. Out of these processes, the service delivered output that included an assessment of mail deliverability and verification of a named individual at an address.

33.    The process outlined above is considered by professional data analysts to be the standard of reasonable proof for determining whether an individual does in fact reside at a particular address.

34.     The analysis of the data performed by the experts on the cancellation list showed at least 340,134[2] Georgians of the 555,702 Georgians whose registrations were cancelled (or 61%) still lived at the address where they lived when they registered to vote. In other words, 61% of voters cancelled for supposedly moving are more likely than not still living precisely where they lived before the inactive-to-cancel process was started against them.



**35.**     Because the results of the expert analysis were not complete until early October 2018 shortly before registration for the 2018 November elections, the Palast Investigative Fund held a press conference to publicize the facts found. Mr. Palast also put the list of those purged on his website and encouraged people to check their registrations and re-register if they were on the list. The website received more than

---

[2] Plaintiffs say "at least" 340,134 because, due to data formatting problems, only 458,556 of the original 555,702 records could be sent through the verification process. The inclusion of the excluded 96,000 records could only have increased the numbers of voters erroneously cancelled from Georgia's rolls, likely increasing the percentage of the 555,702 people whose registrations were cancelled and who have not moved.

100,000 visits. It is not known how many people found they were no longer registered and re-registered.

**Analysis of 2019 Cancellations-Again Over 60% of Georgians Who Had their Registrations Cancelled Had Likely Not Moved**

36.    In light of the above findings, the PIF asked for the data for the cancellations done in 2018 and 2019. In addition, the data was downloaded from the website of the Secretary of State where it is publicly available. Similar processing was performed. As will be seen below, the results showed an even higher percentage of voters having their registrations cancelled than in 2016 and 2017.

**37.**    The Palast Investigative Fund again retained the same experts as in 2018, John Lenser and Mark Swedlund.

38.    The team again utilized the data analysis and address formatting services of CompuTech Direct, Inc. and the NCOA and advanced address correction services (PCOA) of Merkle, Inc., one of 18 USPS full service NCOA licensees. A second USPS full service NCOA licensee, InfoUSA Group, was used to confirm a portion of the results of Merkle, Inc. regarding those registrants identified as being removed by reason of filing an NCOA notice.

39.    The record of 2019 cancellations showed that 313,243 citizens of Georgia had been removed from the voter rolls, based on a claim that they had changed their residency.

40.     The list of removed voters are identified by the reason for the removal of each voter as follows: NCOA, Returned Mail, No Vote/No Contact for two election cycles.

41.     Despite the reason for the removal, all registrants at issue were removed based on the claim that they had moved from their residence.

42.     Specifically, 108,306 registrations of prior registrants were cancelled allegedly for being on the NCOA data file.

43.     An additional 84,376 registrations of prior registrants were cancelled based on alleged returned mail.

44.     Another 120,561 registrations of prior registrants were cancelled based on No Vote/No Contact for 2 elections cycles.

45.     After processing through Merkle Inc., a USPS full-service licensee of NCOA address changes, (with 48 months of change filings), the list of 108,306 identified by Defendant as having their registrations cancelled by reason of their names being on the NCOA lists, and using other forms of list hygiene, the experts found 68,930 citizens had mailable addresses where their registration records said they lived. Due to this rather surprising result, the file of 68,930 registrations was sent by Mr. Lenser to a second USPS full-service licensee, InfoUSA, for NCOA processing.  InfoUSA confirmed the accuracy of Merkle's processing, finding only 118 additional NCOA move records in the file. This small number of additional move records probably resulted from the

elapsed time between the two times the list was processed.   Therefore, substantially 68,812 voters were wrongly removed from the voter rolls.

46.     After subjecting the list of 84,376 identified as returned mail to the list hygiene process at Merkle the experts found 51,785 persons had mailable addresses where their registration records said they had lived. Therefore, another 51,785 voters were wrongly removed from the voter rolls.

47.     After subjecting the list of 120,561 identified as having No Vote/No Contact for 2 election cycles to the list hygiene process at Merkle, the experts found that 79,193 had mailable addresses where their registration records said they had lived. Therefore, another 79,193 voters were wrongly removed from the voter rolls.

48.     Based on the above analysis, in total 199,908 Georgians had their registrations cancelled for allegedly moving when, according to experts in the field, in all likelihood they had not.

49.     This analysis shows a 63.8% error rate in the 313,243[3] list of people whose registrations had been cancelled by Georgia for having moved.

---

[3] The NVRA does not allow a state to remove a voter who has moved within the registrar's jurisdiction, but rather the registrar should make the change of address in their records and notify the voter of the change. See 52 USC § 20507 (c) (1) (B) (i).  The numbers of registrants referred to in this complaint does not include those purged after moving within their county as those persons registrations are to be updated by the registrars. Plaintiffs state the number of people in that category are 8,404. Georgia election law mirrors the NVRA in this respect.  The names of these people are part of the lists downloadable at _____.

**Notice to the Secretary of State of the violations of the NVRA**

50.     After finding these errors, the Palast Investigative Fund provided a report on the findings to the ACLU of Georgia.

51.     On September 1, 2020 the ACLU of Georgia publicly issued the PIF report called "Georgia Voter Roll Purge Errors."

52.     The report contained the information alleged above with respect to claiming errors in the Defendant's voter rolls resulted in wrongful cancellation of their voter registrations based on the wrongful determination that these voters had moved.

53.      The Secretary of State's office was asked about the report by the press. Rather than acknowledging these errors, the Deputy Secretary of State Jordan Fuchs was quoted in the *Atlanta Journal Constitution* in a very hostile manner, questioning Palast's motivation for doing this report.  He called Mr. Palast a known "shill for Stacey Abrams" and questioned why the ACLU of Georgia would hire him.

54.     Mr. Palast is an independent investigative journalist, and was not hired by or acting as a shill for anyone. He was not paid by the ACLU of Georgia. The experts working with Mr. Palast reached their conclusions independently. Their findings were reviewed and adopted by the ACLU of Georgia.

55.     Thereafter, the Secretary of State demanded that the ACLU of Georgia "turn over the list" of names who were claimed to have been wrongfully purged.

56.    It was not possible to simply turn over the list with appended NCOA indicators or a portion of the list based on NCOA indicators since under the terms of the agreement Palast and American Fifth Act had with the USPS licensee stated that the purpose of processing the files through the NCOA licensee was to conduct a mailing.  Further, even if the list was turned over to the Defendant without a review of the evidence to support the list, it would not be clear how the PIF hired experts came to their conclusions.

57.    Thus, in order to provide the results of the PIF expert analysis to the Defendant, Mr. Palast offered to have the PIF experts meet with the State's list maintenance experts to show how the list was determined to see if they could come to agreement that people Defendant claimed had moved had not moved. It was hoped that these voters could be restored to the active voting rolls in a manner similar to the 22,896 voters the Defendant had already returned to the voter rolls.

58.    There was no response to Mr. Palast's offer.

59.    On September 22, 2020 undersigned counsel sent a letter to Defendant. In that letter counsel informed Defendant that Mr. Palast extended an invitation to have the experts who had been working with the PIF, to sit down with the Secretary of States' expert(s) to review the evidence to determine the source of the discrepancies between both groups.

60.    In this September 22, 2020 letter, undersigned counsel stated:

       On September 1, 2020 the ACLU of Georgia released the Palast Investigative Fund's report entitled <u>Georgia Voter Roll Purge Errors</u> that

concluded the State in 2019 had likely removed the voter registrations of nearly 200,000 Georgia citizens on the grounds that they had moved from the address on their voter registration application.

However, according to the US Postal Service and its licensee Merkle Inc. and the nation's leading experts in address verification — known as Advanced Address List Hygiene— these voters did not move.

When the report was released, Mr. Palast and ACLU Georgia Executive Director Andrea Young publicly and repeatedly offered to have the Palast Fund's experts sit down with the Secretary of State's USPS licensee to review the findings to determine the source of the errors on Georgia's list.

By this letter I am formally extending Mr. Palast's invitation to have the expert team which has been working with the Palast Investigative Fund to sit down with the USPS licensee which your office claims you used to develop the list of removed voters.  In addition, the other Address List Hygiene experts are also more than happy to meet with the Secretary of State's Address List Hygiene experts.

As you know because section 8 (c ) (A) of the National Voter Registration Act, Section requires all states which use the National Change of Address registry, to obtain the information from a USPS <u>licensee</u>, one of a small group of designated specialists, if Georgia did use a licensee there should be no reason why you would not want to work with us to address this issue of potentially 200,000 people being denied the right to vote in the upcoming election. Further pursuant to the public disclosure provisions of the NVRA I am requesting on behalf of my client the name of the qualified USPS licensee used to develop the list of persons whose registrations have been cancelled.

As you know, this office on behalf of Mr. Palast did previously file litigation seeking information regarding voter roll purges in 2017. Honorable Eleanor Ross ruled as to the broad scope of the NVRA and the disclosures which must be made.  Further because the NVRA requires state officials like yourself to ensure the voter rolls are accurate, I believe it would violate the NVRA if your office does not want to hear from experts who challenge a good number of the people whose registrations were cancelled.  It is incumbent on your office to address the errors set forth in the Palast Investigative Fund report issued by the ACLU.

I hope to hear from you as soon as possible so we can find out what has caused such vastly different determinations, and to get the wrongly purged persons back on the rolls.

61.    The Defendant did not respond to this letter in any fashion, nor did anyone from the Secretary of State's office respond to this invitation to meet, even though the letter reminded the Defendant of the prior litigation.

*62.*    Thereafter it was reported in the media that the Secretary of State used a company Total Data Technologies as for determining which registrants were to be cancelled based on NCOA information. Total Data Technologies was also identified by the Secretary of State as the service used in *Fair Fight Action Inc. v Raffensperger*.[4]

63.    As noted, the NVRA as well as Georgia law requires that if the NCOA is going to be a basis for a state determining that voters have changed their residence, the state must use a USPS licensee.

64.    Total Data Technologies is not a USPS limited or full service NCOA licensee.

---

[4] *See Fair Fight Action Inc. v Raffensperger* 1:18-cv-5391 [dkt 473, p. 16 footnote 9.] Where it is stated: "The evidence in this case proves painfully the irony of Defendants questioning reliance on a nationally recognized data vendor. From Defendants' internal documents and invoices, it appears that the Secretary of State relies for its entire NCOA matching process to assemble the State's Purge List on the work of a one-person "business" called Total Data Technologies, Inc., located at a residential home in Omaha, Nebraska. (*See* ECF No. 293 at 6 (noting that the same person is president, secretary, treasurer, and director of Total Data Technologies, Inc.); Ex. 8 (STATE-DEFENDANTS-00287072 (listing the address of Total Data Technologies, Inc. as 11802 Washington Plaza, Omaha, NE)); Ex. 9 (Zillow print-out for the same address showing residential home).

65.     On October 19, 2020 counsel for the PIF again wrote to the Defendant stressing

the urgency of the experts meeting to review the list, and again have their experts

determine the veracity of the PIF's work. The PIF also offered to pay for a USPS licensee

to evaluate the data.

66.     The letter stated in part:

> We are writing to demand that you obtain and review the evidence that your
> office has wrongly removed no less than 198,351 voters from the registration
> rolls. As you have acknowledged, the American Civil Liberties Union of Georgia
> released a report, referenced here, by the Palast Investigative Fund. This report
> provides detailed evidence by the nation's top experts in address verification,
> including the official licensee of the US Postal Service, which took issue with
> your removal of these 198,351 voters moved, justifying canceling their
> registrations.

67.     The letter continued:

> On behalf of Mr. Palast, I am asking, in fact, demanding, that you review
> the list provided by the experts of the wrongly purged and the evidence. To this
> end, Mr. Palast is offering to assist, and even cover the cost of, obtaining the
> correct list of voters who have moved and those who have not.  This can be done
> in two days without violating the Palast Investigative Fund's contract with the
> Post Office nor violating privacy of individuals. For example, The Secretary of
> State's records indicate that 108,306 voters were purged because they were
> allegedly identified by the Postal Service's National Change of Address (NCOA)
> registry. In fact, the official US Postal Service licensee, Merkle Inc., has
> identified only 27,898 of those voters as having moved.

68.     The letter further pointed out:

> It appears your errors occurred because you did not hire a Postal Service
> licensee as required by law. To wit: The National Voter Registration Act 52 USC
> 20507 (c) states under the heading, "Voter Removal Programs,"
> (1) A State may meet the requirement of subsection (a)(4) by establishing
> a program under which—

(A) change-of-address information supplied by the Postal Service through its **licensees** is used to identify registrants whose addresses may have changed...

Mr. Palast is prepared to help you correct the errors immediately in time for legitimate voters to be returned to rolls for this election.

Here is the rapid, safe procedure we propose:

1.      The Palast Fund will pay for the leading Postal Service Licensee, Merkle Inc., to provide the licensed National Change of Address registry to compare to the list marked "NCOA" by the Secretary of State. We are informed the Secretary of State used a marketing company called Total Data Technologies of Nebraska. (TDT, apparently, is not a Postal Service licensee—though a licensee is required by the National Voter Registration Act in order to purges voters who did not report their move.)
The Secretary of State will have to sign the USPS' license agreement—and follow its requirements and restrictions. **One requirement is that the Secretary of State use the list for mailing.** We suggest you use the mailing to notify voters that they have had their rights restored. I would note that the Palast Fund's list was used by Black Voters Matter to inform 98,000 voters you have cancelled their registrations.

2.      Mr. Palast will authorize the address list hygiene experts, led by John Lenser, to meet immediately --safely, via Zoom-- with TDT or anyone the Secretary of State designates to go over the lists and determine the source of error in the state's un-licensed list—and help the state make any corrections.  We will also pay for additional assistance by address hygiene experts at Computec Inc. to help with any related technical matters.

3.      There is no need to make the meeting of experts a closed session. If the Secretary of State wishes, the public can be invited to watch the Zoom meeting live. We encourage such open government.

4.      This could all be done swiftly, within 48 hours if the participants can coordinate time.

5.      A legitimate concern has been expressed by Black Voters Matter Fund that rather than this offer resulting in a sincere review of the veracity

of the purge list for the purpose of returning wrongly dis-enfranchised voters to the rolls, that it will end up as a "PR stunt." The concern is that the Secretary's functionaries will simply pour over names, to try to find voters now dead or who moved, to attempt to dismiss our expert's findings and refuse to consider the plight of voters who have been wrongly placed your lists.

In this regard, it should be noted that our experts used the address status of voters in October 2019, to match the Sec. of State's time frame. It's now been a year, so doubtless, thousands of the over 198,000 identified as wrongly purged have, in these 12 months, moved or died. That does not discredit the findings that the overwhelming majority of this group were wrongfully removed from the voter rolls.  I want to also inform you that this group is only those who have not moved at all, and does not include people who moved within their own county, who I believe should not have been removed.

69.     The letter further stated:

This proposed method above will allow an update to data current with the Post Office and other sources.

There is no harm returning names to the rolls, even if some are now departed: there is zero evidence of impersonation voter fraud in Georgia. On the other hand, there is heartbreaking evidence of the damage caused to voters like King's cousin Christine Jordan who were wrongly purged. Their vote should be restored.

I know that neither the ACLU, the Palast Investigative Fund nor the experts can determine the sincerity of the Secretary of State's desire to review the list. Nevertheless, this offer will put the list in the state's hands to offer the State the chance to rectify this wrong. Mr. Palast cannot know in advance if the State will act in good faith to do this, however he is prepared to help the State obtain and analyze the list rapidly.

As you know, the NVRA is clear. Your office must maintain "accurate" voter rolls. You are not free to make voter rolls inaccurate by purging voters based on wrong information and inaccurate methods. Now that you know of the errors it is incumbent on you to take the necessary steps to make the rolls accurate.

*70.*    The letter concluded: "Mr. Palast and I are prepared to work with your office to restore the accuracy of Georgia's voter rolls."

71.    Neither the Secretary of State nor anyone associated with his office responded to this letter.

72.    Mr. Palast in the meantime publicized the existence of this list and created a place on his website (gregpalast.com/SaveMyVote2020.org) that invited Georgia residents to check if their registrations had been purged and instructed them how to re-register.

73.    It is not known how many of the people on the lists checked their registrations and re-registered.

**74.**    With the concurrence of Mr. Palast, on behalf of the Black Voters Matter Fund, American Fifth Act mailed 95,656 first class mail pieces to approximately half of the citizens who appeared on the cancellation list but who the experts determined had not moved.


**The Prior Attempt in *Fair Fight Action Inc*. to Prevent the Removal of the 120,000 Registrants in the Use it Or Lose it Category, Suffered, inter alia, from Deficits Which Plaintiffs' Evidence Addresses**


75.    In December of 2019 the Plaintiffs *in Fair Fight Action Inc. v Raffensperger* moved for an injunction to prevent the Secretary of State from automatically removing the 120,000 voters who the State claimed were subject to removal under the prior provisions of "Use it or Lose it".

76.     That is, in light of the fact that the State had passed legislation to increase the time of no contact from 3 to 5 years, Plaintiffs sought to prevent the 120,000 from having their registrations cancelled as they had only had no contact for 3 years.

77.     The Plaintiffs asked the court to give those provisions of the new law retroactive effect.

78.     The Court declined to interpret State law on Eleventh Amendment grounds. [18-cv-5391 dkt# 188 opinion p.   17].

79.     Although the Plaintiffs therein claimed that to cancel these voters based on the no contact claim would in effect disenfranchise them, the Secretary of State stated that it was easier to restore persons to the active voting rolls than to stop the program that was set to cancel the registrations. Indeed, it was stated that these registrations could be restored within 24 to 48 hours.  See *Fair Fight Action Inc. v Raffensperger*, [18-cv-5391 dkt 188 opinion p. 7 ].

80.     The Court noted the limited factual record to support the Plaintiffs request for injunctive relief.  [18-cv-5391 dkt # 188 p. 27].

81.     The evidence presented in the above as to the no contact group applies only to the persons whose registrations were cancelled after 3 years of no contact, and who failed to return a confirmation post card and then did not vote in the next two general elections.

82.     Without addressing whether a non-descript mailer provides any or sufficient notice that a registrant could be or is about to be removed from the rolls, the evidence

herein shows that almost 200,000 Georgian citizens had their registrations cancelled for having moved when all the evidence is to the contrary.

## COUNT I

## VIOLATION OF NVRA FOR FAILURE TO USE A USPS LICENSEE TO EVALUATE NCOA LISTS AND REMOVING REGISTRANTS FROM THE VOTER ROLLS FOR MOVING WHEN THEY HAVE NOT MOVED

83.    Plaintiffs repeat and re-allege each of the allegations contained in this complaint as if fully stated herein.

84.    52 USC §20507 (c ) provides: **(1)** A State may meet the requirement of subsection (a)(4)(that is, a general program to remove ineligible voters)  by establishing a program under which—**(A)** change-of-address information supplied by the Postal Service through its licensees is used to identify registrants whose addresses may have changed;

85.    Due to the Defendant's failure to follow the NVRA requirement to use a USPS licensee to identify persons who filed NCOA notice and have changed their residences, the Defendant has wrongfully cancelled the registrations of 68,930 Georgians of the 108,306 of those removed based on allegedly filing an NCOA change of address, as their names were not on the lists of the USPS NCOA licensees list.

86.    Further, the list hygiene experts who also subjected the "use it or lose it" and returned mail lists of voters to advanced list hygiene, determined that 51,785 of the

84,376 registrants who were identified as having returned mail had mailable addresses at their address of registration and 79,193 of 120,561 identified under "use it or lose it" also still had mailable addresses at their address of registration.

87.     The National Voter Registration Act provides for a private right of action 90 days after the chief election officer receives notice of a possible violation. (52 U.S.C.S. § 20510(b)(1))

88.     Defendant was put on notice of the violation of the NVRA on September 1, 2020 through the issuance of the report of Greg Palast and the Palast Investigative Fund issued by the ACLU of Georgia. Counsel for the PIF sent two letters to the Secretary of State asking to resolve these same errors which were not responded to. This case is being filed as the 90-day notice expired.

89.     Pursuant to 52 U.S.C. § 20510 (b)(2) and 42 USC §1983 Plaintiffs bring this action to seek all declaratory and injunctive relief to ensure the individuals wrongfully removed from the voter rolls are restored to the voting rolls in time to vote in the January 5, 2021 run-off.

## COUNT II
## VIOLATION OF NVRA'S REQUIREMENT TO HAVE ACCURATE AND CURRENT VOTER LISTS

90.     Plaintiffs repeat and re-allege each of the allegations contained in this complaint as if fully stated herein.

91.     52 USCS § 20501 (4) states one of the purposes of the NVRA is to ensure that accurate and current voter registration rolls are maintained.

92.     Based on the work of the experts who have evaluated the lists of cancelled registrations, it was determined that 199,908 still have mailable addresses at their address of registration so they have not likely moved.

93.     The effect of the removal of so many registrants based on having moved when the evidence is to the contrary is to make the voter registration rolls less current and less accurate in violation of one of the main purposes of the NVRA.

94.     Further the Defendant, despite being given ongoing notice of errors in the list, failed to take any steps to make the voter rolls accurate and current.

95.     Plaintiffs are bringing this action after the 90- day notice period expired.

96.     Pursuant to 52 U.S.C. § 20510 (b)(2) Plaintiffs bring this action to seek all declaratory and injunctive relief to ensure the individuals wrongfully removed from the voter rolls are restored to the voting rolls in time to vote in the January 5, 2021 run-off.

## COUNT III

## THE IMPLEMENTATION OF GEORGIA' S USE IT OR LOSE IT VIOLATES THE FOURTEENTH AMENDMENT TO THE CONSTITUTION

97.     Plaintiffs repeat and re-allege each of the allegations contained in this complaint as if fully stated herein.

98.    As noted under the "use it or lose it" process, set forth in O.C.G.A. §§ 21-2-234 and 21-2-235, before the later 2019 amendments, voters who had not voted or made contact with any election's offices in the state of Georgia over a period of three years are mailed a notice at the address corresponding to their voter registration information, asking them to confirm within 30 days whether they still live at that address. If elections officials receive no response at the expiration of 30 days, the voter is moved to an "inactive list." If they failed to make contact with elections officials—either by voting in any election or any other form of contact—over another two general elections, their voter registration was cancelled. Such registrants were not given notice of their removal at the time of removal, and possibly only discovered it when they went to vote in a subsequent election.

99.    The Georgia law is patterned after the NVRA which allows states to engage in a general program of removal of persons ineligible to vote, but this program is limited to removal of persons who are ineligible by reason of death or change of residence. See  52 USCS § 20507 (a)(4) (A) and (b).

100.    This process of using a combination of no contact, no response to a postcard and no vote in the next two general elections was designed to be a proxy for the presumption that a registrant had changed their residence.

101.   Through the expert analysis of the lists of citizens removed from Georgia's voting rolls under the "use it or lose it" process, show that over 60% of the time these Georgia citizens have not moved from the address on file with the Secretary of State.

102.   Based on the foregoing Georgia's "use it or lose it" law, as applied, violates the Equal Protection clause of the Fourteenth Amendment to the United States Constitution by creating distinctions in the law which are wrong more the half the time disenfranchising, infrequent voters.

103.   The Plaintiffs in *Fair Fight Action Inc v Raffensperger* have challenged these same laws under the First Amendment as they penalize registrants for exercising their right not to vote.

104.   Plaintiffs herein allege an additional basis for the constitutional infirmity of the "use it or lose it" framework as applied, in that it is not a predictor of change of residence, which is a legitimate basis for removing a registrant from the voter rolls, but, in fact, deprives thousands of people their fundamental right to vote.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiffs respectfully request that this Court:

A. Declare that Defendant has violated the NVRA and the Equal protection Clause of the US Constitution as stated in this complaint.

B. Issue a temporary restraining order and preliminary injunction restraining the Defendant from keeping the persons referred to in this complaint off the voter rolls for the January 5, 2021 runoff election.

C. As an alternative, the Court order the Defendant and the experts from the PIF to meet immediately, in the presence of a special master or other expert to be appointed by the Court to allow the PIF experts to show their reasons why each registrant who was cancelled had not moved and that the Defendant be required to restore those citizens to the active voting rolls where the evidence presented to the special master or expert shows the person was wrongly removed.

D. Award Plaintiffs their costs and expenses and attorneys' fees as provided by law.

E. Grant any other relief as the Court deems just and proper.

Respectfully submitted on this 8th day of December 2020,

By: /s/ Gerald A. Griggs
Gerald A. Griggs
Georgia Bar No. 141643
Lead Attorney for Plaintiffs

1550 Scott Blvd
Decatur, Ga. 30030
(404) 633-6590
Gerald@geraldagriggs.com

By: /s/ Jeanne Mirer

Jeanne Mirer
New York Bar No. 4546677
Lead Pro Hac Vice Attorney for Plaintiffs

Mirer, Mazzocchi & Julien PLLC
1 Whitehall Street, 16th Floor
New York, NY 10004
jmirer@mmsjlaw.com
(212) 231 2235

By: /s/ Tricia P. Hoffler

Tricia P. Hoffler, Esq.
Georgia Bar No. 666951
Co-Counsel for Plaintiffs

The CK HOFFLER FIRM
23 Lenox Pointe
Atlanta, GA 30324
Telephone:  (404) 263-0201
Facsimile:   (404) 263-0202
E-Mail: ck@ckhofflerfirm.com

By: /s/ Maria O. Banjo

Maria Olabosipo Banjo
Georgia Bar No. 266098
Co-Counsel for Plaintiffs

Maria O. Banjo, LLC
1550 Scott Blvd
Decatur, GA 30033
404-226-8081
Email: maria@mariabanjo.com

By: /s/ Fred David Gray

Fred David Gray, Esq.
Alabama Bar No. 1727R63F
Co-Counsel for Plaintiffs
Pro Hac Vice Application Forthcoming

Gray, Langford, Sapp, McGowan, Gray, Gray & Nathanson, PC
108 Fred Gray Street
Tuskegee, AL 36083-0239
Telephone: (334) 727-4830
Facsimile: (334) 727-5877
E-Mail: fgray@glsmgn.com