IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| BLACK VOTER'S MATTER FUND, *et al.*,<br><br>    *Plaintiffs,*<br><br>v.<br><br>BRAD RAFFENSPERGER, in his official capacity as the Georgia Secretary of State and Chair of the Georgia State Election Board,<br><br>    *Defendant.* | CIVIL ACTION FILE<br>NO. 1:20-cv-04869-SCJ |

## DEFENDANT SECRETARY OF STATE'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

## INTRODUCTION

Georgia's voter-list-maintenance process has, at the very least, been a topic of discussion for several years. Not including the dozens of cases surrounding election administration in Georgia, it was nearly a year ago that this Court denied a motion for preliminary injunction to reinstate voters that had been identified during the voter-list-maintenance process in Georgia. *See Fair Fight Action v. Raffensperger*, Case No. 1:18-cv-05391-SCJ, Doc. No. 188 (December 27, 2019) (the "FFA Order"). Plaintiffs' new theory is that, because

their "list hygiene" analysis—by a single expert using data from sources other than the Postal Service—shows that Georgians whose registrations were cancelled have "mailable addresses where their registration records said they lived," Doc. No. [27] at ¶ 46, the 2019 cancellations were improper.

Based on this new theory, Plaintiffs ask this Court to reinstate three groups of voters who were moved to cancelled status almost a year ago: (1) 68,812 registrations cancelled because the individuals were moved to inactive status because they appeared in the National Change of Address (NCOA) database and then did not respond to confirmation notices, Doc. No. [27] at ¶ 45, Doc. No. [6-1], p. 6[1]; (2) 51,785 registrations cancelled because the individuals were moved to inactive status because they had mail returned and then did not respond to confirmation notices, Doc. No. [27] at ¶ 46, Doc. No. [6-1], p. 6; and (3) 79,193 registrations cancelled because the individuals were moved to inactive status because they had no contact with election officials and then did not respond to confirmation notices, Doc. No. [27] at ¶ 47, Doc. No. [6-1], p. 6. These three categories total just short of 200,000 cancelled records.[2]

---

[1] All pinpoint citations for pleadings refer to the blue CM/ECF references at the top of each page.

[2] Plaintiffs say the total number is 199,908 in their Amended Complaint, Doc. No. [27] at ¶ 48, but that number appears to include 118 additional move records found by InfoUSA. *Id*. Plaintiffs also provide a different total of 195,181 in a footnote, Doc. No. [27], p. 5 n.1, but acknowledge that some (or all) of the

Plaintiffs do not submit any declarations from any voters who claim they were improperly cancelled.

This Court should not grant the relief requested by Plaintiffs. First, as explained in the accompanying motion to dismiss, they did not properly give pre-suit notice as required by the National Voter Registration Act (NVRA), depriving this Court of jurisdiction over the NVRA claims in Counts I and II of their Complaint and they also do not have standing to bring any of their claims. Second, Plaintiffs admit they have known of the factual basis for this lawsuit for more than a year, Doc. No. [7] at ¶ 45, and yet delayed filing it (and this motion) until barely more than 30 days before the runoff election they seek to impact. Third, Plaintiffs cannot succeed on the merits because they misread the requirements of the NVRA and Georgia properly uses Postal Service data to conduct its list maintenance. Fourth, Plaintiffs cannot show any basis for irreparable harm to themselves as a result of a denial of injunctive relief. Finally, Plaintiffs delayed too long in filing their Complaint and the public interest and equities weigh strongly against making further changes to Georgia's voter-registration records at this late date. This Court should deny

---

22,896 individuals who were moved back to inactive status in December 2019 by the Secretary of State may also be on the list. So the total number of wrongful cancellations alleged in Plaintiffs' Complaint appears to be somewhere between 172,285 and 199,908.

Plaintiffs' motion and allow the runoff election to move forward on its normal course.

## FACTUAL BACKGROUND

### I.   Process for voter-list maintenance.

Before a voter is moved into cancelled status, Georgia law requires that the individual first be placed on the inactive list. Individuals can be placed on the inactive list when they appear in the NCOA database, when mail sent to the voter is returned to election officials by the Postal Service, and when there has been no contact for a period of time:

- *Moved from the Active to the Inactive List for NCOA*: During odd-numbered years, the Secretary of State compares the list of electors to change-of-address information from the U.S. Postal Service. O.C.G.A. § 21-2-233(a). If (1) it appears from those records that the voter has moved to an address outside the boundaries of the county, (2) a confirmation notice is mailed to the voter and, (3) if the voter does not respond within 30 days, then the voter is moved into "inactive" status. O.C.G.A. § 21-2-233(c). Voters in the inactive status can vote a regular ballot, just like voters in active status.

- *Moved from the Active to the Inactive List for Returned Mail*: if (1) mail to a voter is returned, that is information from the Postal Service

4

indicating that the voter appears to have moved, so (2) a confirmation notice is mailed to the voter and, (3) if the voter does not return it, then the voter is moved into "inactive" status. O.C.G.A. § 21-2-234(b). Voters in the inactive status can vote a regular ballot, just like voters in active status.

- *Moved from the Active to the Inactive List for No Contact:* if (1) a voter has had no contact with the election superintendent in the preceding five calendar years; (2) a confirmation notice is mailed to the voter and, (3) if the voter does not return it, then the voter is moved into "inactive" status. O.C.G.A. § 21-2-234(a)(1), (2); (g). Voters in the inactive status can vote a regular ballot, just like voters in active status.

- *From Inactive to Active*: if at any point in the process, the voter has contact with election officials in which he or she confirms or updates his or her address, votes, or updates his or her voter record through the Department of Driver Services, the voter is restored to active status. O.C.G.A. § 21-2-235(a), (d).

- *From the Inactive List to Cancelled Status*: if voters on the inactive list (1) have no further contact with election officials for the next two November general elections, (2) another notice is mailed to the voter, and

(3) if the voter fails to respond, then that voter's status is moved to cancelled. O.C.G.A. § 21-2-235(a) and (b).

## II. Plaintiffs' claims about voter-registration records.

Plaintiffs rely on a single witness, John Lenser,[3] for all of the facts in their motion. Doc. No. [6-1], pp. 4-7. As this Court will recall, Georgia publicly released its list of individuals who were set to be moved from inactive to cancelled status in October 2019. *Georgia Secretary of State's Office Cleans Voter File by 4 Percent as Required by Law,* https://sos.ga.gov/index.php/elections/georgia_secretary_of_states_office_cleans_voter_file_by_4_as_required_by_law (October 28, 2019).

Mr. Lenser processed Georgia's list through two companies that use "advanced list hygiene capability." Doc. No. [6-1], p. 5; Doc. No. [7] at ¶ 25. Mr. Lenser's advanced list hygiene includes more than just information from the Postal Service—it also includes "proprietary change of address services" that are conducted by Merkle, Inc. using updates from "retail transactions, financial transactions, and subscriptions." Doc. No. [7] at ¶¶ 21, 35-36, 38. Postal Service

---

[3] The *Fair Fight Action* plaintiffs initially disclosed Mr. Lenser as an expert in that case. *Fair Fight Action,* Doc. 87. Mr. Lenser never provided a report in *Fair Fight Action,* despite discussion of the need for discovery he would review during the January 30, 2020 discovery conference—well after his analysis of Georgia data was apparently complete. *Fair Fight Action,* Tr. Jan. 30, 2020 at 69:14-21, 75:8-20.

data is only one of several sources utilized by Merkle. Doc. No. [7] at ¶ 41. Mr. Lenser's declaration indicates that the various "processes" (which he does not further describe) deliver a result that includes "an assessment of mail deliverability and verification of a named individual at an address." Doc. No. [7] at ¶¶ 26, 43. Mr. Lenser does not indicate what threshold he uses for the "standard of reasonable proof" that an individual resides at a particular address. Doc. No. [7] at ¶ 27.

The comparison process used by Mr. Lenser's vendors included a 48-month NCOA match and the non-NCOA information that he says covers two decades of records. Doc. No. [7] at ¶ 39. Mr. Lenser also acknowledges that this process is not perfect—and it apparently has an error rate of up to 5% in determining if an individual resides at a specific address. Doc. No. [7] at ¶ 44.

While Mr. Lenser's vendors conducted the analysis he outlines in his declaration in November 2019, he did not work on Georgia's file again until August 2020. Doc. No. [7] at ¶ 55. Mr. Lenser said he conducted a mailing to a subset of the voters on the list, 95,656, by focusing on eleven counties, but never indicates how many of those postcards were returned as undeliverable

or whether he gained additional information from that mailing. Doc. No. [7] at

¶ 63.[4]

## III.   Georgia's NCOA vendor.

Total Data Technologies is the Secretary of State's current vendor for

NCOA services. Dec. of Chris Harvey, attached as Ex. A ("Harvey Dec.") at ¶

3. Total Data Technologies utilizes the 48-month NCOA file from Anchor

Computer, as evidenced by the reports it generates and sends to the State's

voter-registration-database vendor. Harvey Dec. at ¶¶ 4-5; *see also* Doc. No. [7-

2], p. 2 (identifying Anchor Computer, Inc. as a full-service provider licensee).

Total Data Technologies is a reseller or broker for Anchor Computer. Harvey

Dec. at ¶ 6.

## <u>ARGUMENT AND CITATION OF AUTHORITY</u>

Because temporary restraining orders and preliminary injunctions are

such extraordinary and drastic remedies, courts may not grant this type of

relief "unless the movant clearly established the 'burden of persuasion' as to

the four requisites." *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th

Cir. 1998) quoting *All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp., Inc.*,

---

[4] While Mr. Lenser states that the postcard mailing was paid for by "Black
Voters Matter Fund," Doc. No. [7] at ¶ 64, Plaintiffs' First Amended Complaint
alleges that the payment was from a separate organization, BVM Capacity
Building Fund. Doc. No. [27] at ¶ 1.

887 F.2d 1535, 1537 (11th Cir. 1989). Plaintiffs must show that: (1) they have a substantial likelihood of success on the merits of their claims; (2) they will likely suffer irreparable harm in the absence of an injunction; (3) the balance of equities tips in Plaintiffs' favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365, 374 (2008).

Preliminary injunctions are never granted as of right, even if a plaintiff can show a likelihood of success on the merits. *Benisek v. Lamone*, 138 S. Ct. 1942, 1943–44 (2018). While a preliminary injunction is already a form of extraordinary relief, that relief is even more drastic in the context of elections, because of the public interest in orderly elections and the integrity of the election process. *Purcell v. Gonzalez*, 549 U.S. 1, 4–5, 127 S. Ct. 5 (2006).

Also noteworthy here is the U.S. Supreme Court's recognition that when "an impending election is imminent and a State's election machinery is already in progress," equitable considerations justify a court denying an attempt to gain immediate relief. *Reynolds v. Sims*, 377 U.S. 533, 585 (1964); *see also Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) ("This Court has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election."). This is because parties must show they exercised reasonable diligence, especially in the context of elections. *Benisek*, 138 S. Ct. at 1944. Further, where absentee

ballots are "already printed and mailed," "[a]n injunction here would thus violate *Purcell's* well-known caution against federal courts mandating new election rules—especially at the last minute." *New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1283 (11th Cir. 2020).

## I.     Plaintiffs do not show a likelihood of success on the merits.

### A.     *Plaintiffs' claims are not properly before this Court.*

As explained in the Secretary's Motion to Dismiss,[5] which is incorporated by reference, Plaintiffs have not sufficiently alleged standing, have not supported their claims of standing with any evidence before this Court, failed to comply with the pre-suit requirements of 52 U.S.C. § 20510(b)(2), and delayed in bringing this case. The Secretary will not repeat those arguments here, but they form an independent basis to deny the motion for preliminary injunction.

---

[5] As the Secretary's Motion to Dismiss, Doc. No. [28] was being filed, Plaintiffs filed a First Amended Complaint, Doc. No. [27]. This response brief was due at 5:00PM, less than an hour after the filing of the First Amended Complaint, but the only change appears to be to add a plaintiff and adjust some statements about BVMF's activities. The Secretary will file a renewed Motion to Dismiss updated to the allegations in the First Amended Complaint but the jurisdictional arguments will remain the same.

*B.    Plaintiffs misread the requirements of the NVRA.*

Plaintiffs first claim that the State of Georgia violated the NVRA "by failing to use a USPS licensee" to conduct its NCOA process and returned mail process. Doc. No. [6-1], pp. 17-18. But in so doing, Plaintiffs fail to read the actual requirements of the statute.

1.    <u>The NVRA does not require the direct use of a full-service licensee.</u>

The NVRA requires states to "remove the names of ineligible voters from the official lists of eligible voters" when those voters have changed residence. 52 U.S.C. § 20507(a)(4)(B). As the Supreme Court recognized, a key purpose of the NVRA was exactly that: "removing ineligible persons from the States' voter registration rolls." *Husted v. A. Philip Randolph Inst.*, 138 S. Ct. 1833, 1838 (2018).

States can comply with the requirement by establishing a program under which "change-of-address information supplied by the Postal Service through its licensees is used to identify registrants whose addresses may have changed." 52 U.S.C. § 20507(c)(1)(A). Similarly, Georgia law requires use of address information "supplied by the United States Postal Service through its licensees" for change-of-address information. O.C.G.A. § 21-2-233(a). The plain language of both statutes requires that the change-of-address *information* be

11

from the U.S. Postal Service, but does not require that the State use a particular type of *licensee* for this purpose. Plaintiffs' claim that Georgia must use a full-service licensee directly fails at this point. Doc. No. [6-1], p. 17. (This statutory process is also in contrast to the processes urged by Plaintiffs, which use a variety of non-Postal-Service sources for change-of-address information. Doc. No. [7] at ¶¶ 35-38, 41-42.)

> 2.   Georgia uses information from the Postal Service to locate
>      possible address changes.

As Plaintiffs correctly note, Georgia uses Total Data Technologies in Nebraska for evaluating its voter list against the NCOA database. Harvey Dec. at ¶ 3. Total Data Technologies uses the 48-month database information from Anchor Computer, which is a full-service licensee, to conduct the NCOA matches for Georgia. Harvey Dec. at ¶¶ 4-6; Doc. No. [7-2], p. 2. Thus, the State of Georgia uses "change-of-address information supplied by the Postal Service through its licensees," to conduct its list-maintenance process. 52 U.S.C. § 20507(c)(1)(A). Further, the NVRA does not require (or apparently authorize) the use of non-Postal-Service sources in the plain language of the statute, as Plaintiffs apparently urge this Court to require. *Id.*

This information is used to identify registrants whose addresses have possibly changed, but those voters are not immediately removed from the voter

list. Instead, a confirmation notice is sent and the voter is moved to the inactive list if he or she does not respond within 30 days. O.C.G.A. § 21-2-233(c); *see also* 52 U.S.C. § 20507(d)(2). Only after the voter remains on the inactive list for two general election cycles and fails to respond to another confirmation notice or take any other action to engage with election officials is their registration record moved to cancelled status. O.C.G.A. § 21-2-235(b); 52 U.S.C. § 20507(d)(1)(B).

> 3.    <u>Georgia moves individuals with returned mail and no contact to inactive status.</u>

In addition to change-of-address information, the NVRA also allows a state to comply with its requirements by relying on information from the Postal Service that an individual has moved. 52 U.S.C. § 20507(c)(1)(B). Mail returned from the Postal Service after being mailed to a voter is information that the voter might have moved. As a result, returned mail generates a confirmation notice and if a voter does not respond, he or she is moved to the inactive list. O.C.G.A. § 21-2-234(b).

Similarly, as this Court is aware, a voter is moved to the inactive list if a voter has no contact with election officials for five calendar years, meaning:

> the elector has not filed an updated voter registration card, has not filed a change of name or address, has not signed a petition which is required by law to be verified by the election superintendent of a county or municipality or the Secretary of State, has not signed a voter's

certificate, has not submitted an absentee ballot application or voted an absentee ballot, and has not confirmed the elector's continuation at the same address during the preceding five calendar years.

O.C.G.A. § 21-2-234(a)(1). In the first six months of each odd-numbered year, a prepaid confirmation notice is sent to each such voter. O.C.G.A. § 21-2-234(c). If the voter fails to respond within 30 days, he or she is moved to the inactive list. O.C.G.A. § 21-2-234(g).

4.   Plaintiffs are not likely to succeed on their NVRA claims.

As discussed above, Georgia uses information from the Postal Service to perform the processes required by the NVRA in conducting list maintenance. While Plaintiffs wish this Court to impose a different set of obligations—to use non-Postal-Service information and to require the direct use of a full-service licensee—neither of those additional proposals are required by the NVRA. As a result, Plaintiffs are not likely to succeed on their claim that Georgia's current processes violate the NVRA.

C.   *Plaintiffs are not likely to succeed on their constitutional challenge to list maintenance for Georgia's no-contact process.*

Unlike their challenge to the NCOA and return-mail processes as noncompliant with the NVRA, Plaintiffs' only constitutional challenge is to Georgia's no-contact maintenance process. Doc. No. [27] at ¶¶ 97-104; Doc. No. [6-1], pp. 21-24. Plaintiffs offer only scant additional evidence that was not

14

before the Court last year when considering (and denying) a motion for a preliminary injunction on the same issue.

As this Court recognized when assessing the constitutional challenge to the no-contact process last year, "States have the power to impose voter qualifications, and to regulate access to the franchise in other ways." FFA Order, p. 21 quoting *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972). Plaintiffs' constitutional claim is that Georgia's no-contact process violates the Equal Protection Clause "by creating distinctions in the law which are wrong more than half of the time disenfranchising, infrequent voters." Doc. No. [27] at ¶ 102.[6]

While the Equal Protection Clause prohibits jurisdictions from treating similarly-situated voters differently, *Bush v. Gore*, 531 U.S. 98, 104, 121 S. Ct. 525, 530 (2000), Plaintiffs' challenge is to specific voter-registration processes that they claim restrict the right to vote. Doc. No. [6-1], p. 22. As a result, the proper standard to review the constitutionality of Georgia's no-contact process is the *Anderson-Burdick* sliding scale. *Burdick v. Takushi*, 504 U.S. 428, 433, 112 S. Ct. 2059, 2063 (1992) (cannot use strict scrutiny to "tie the hands of

---

[6] Plaintiffs admit that Georgia's no-contact process is "patterned after the NVRA." Doc. No. [27] at ¶ 99. A process identical to that used by Georgia has been upheld as compliant with the NVRA, as this Court recognized last year. FFA Order, p. 28 n.23; *Husted*, 138 S. Ct. at 1842.

States seeking to assure that elections are operated equitably and efficiently"). This is also the proper standard to the extent that Plaintiffs are also challenging the no-contact process under the First Amendment. *Id*. at 434; *see also* Doc. No. [27] at ¶¶ 103-104.

As this Court is aware, under *Anderson-Burdick*, the Court weighs the alleged burden on the right to vote against the State's interests. *Burdick*, 504 U.S. at 433. When a court reviews "reasonable, nondiscriminatory restrictions" on the rights of voters, "the State's important regulatory interests are generally sufficient to justify" the restrictions. *Id*. at 434. Only if the challenged law or practice imposes a "severe" burden must it be evaluated to determine if it is narrowly tailored and advances a compelling state interest. *Id*.

When this Court reviewed the no-contact process a year ago, it evaluated arguments from a different group of plaintiffs raising essentially the same issues. At that time, the Court evaluated the evidence presented, focusing on the allegation that there was a "substantial risk that individuals will be erroneously deprived of their constitutional right to vote." FFA Order, p. 23. The *Fair Fight Action* plaintiffs also provided declarations from eight voters attesting that they had not moved—something missing from the filings in this case. *Id*., pp. 25-26.

As the Court recognized then, the burden of returning a prepaid, preaddressed confirmation notice was not a severe burden on the right to vote. *Id.*, p. 27. The Court also recognized the regulatory interests of the State in (1) maintaining a reliable list of electors, (2) applying election laws as written, and (3) eliminating voter confusion and improving election-day operations, finding all three of those regulatory interests sufficient to satisfy *Anderson-Burdick*. *Id.*, pp. 28-29.

Facing this record and history, Plaintiffs offer a single declaration attesting that—based solely on non-Postal-Service "address hygiene" records— some individuals who were moved to cancelled status may not have changed residences. Doc. No. [6-1], pp. 23-24. But that is actually less support for Plaintiffs' claims than similar evidence directly presented to the Court a year ago by four voters who had not moved but were moved to cancelled status. FFA Order, p. 26. The key question was not the basis for removal, but rather whether any of the voters were precluded or burdened by registering to vote again. *Id.*, pp. 26-27.

In this case, Plaintiffs processed the lists in November 2019, prior to the cancellation of registrations last year. Doc. No. [7] at ¶¶ 30-31, 45-54, 55. They have provided no evidence that any individuals who had more than 10 months

between their transfer to "cancelled" status in December 2019, and the voter-registration deadline in October 2020, were unable to register to vote.

Because the evidence before the Court does not demonstrate anything more than a slight burden on the right to vote, Plaintiffs cannot succeed on their constitutional claim to Georgia's no-contact process, because "the State's important regulatory interests are sufficient to justify" the restrictions. *Burdick*, 504 U.S. at 434.

## II.   Plaintiffs do not establish irreparable harm.

Plaintiffs make the conclusory claim that, because "potential voters will lose their ability to vote in the upcoming run-off election," Plaintiffs will suffer harm that is "irreparable." Doc. No. [6-1], p. 24. But Plaintiffs fail to establish such a violation, and they do not acknowledge the reality that not every perceived injury related to voting threatens the right to vote. *See, e.g.*, *McDonald v. Bd. of Election Comm'rs*, 394 U.S. 802, 807, 89 S. Ct. 1404, 1408 (1969) (threat to right to absentee ballot, not right to vote). Further, "[a]lthough the right to vote is fundamental, '[i]t does not follow, however, that the right to vote in any manner . . . [is] absolute." *Gwinnett Cty. NAACP v. Gwinnett Cty. Bd. of Registrations & Elections*, 2020 U.S. Dist. LEXIS 36702 *14–15 (March 3, 2020) quoting *Burdick*, 504 U.S. at 433.

In the context of a preliminary injunction, "the asserted irreparable injury 'must be neither remote nor speculative, but actual and imminent.'" *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) quoting *NE Fla. Chapter of Ass'n of Gen. Contractors v. Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990). But here, Plaintiffs' purported injuries are entirely speculative and remote. Moreover, even assuming this case implicates irreparable harm to a person's right to vote, Plaintiffs are organizations proceeding under a diversion-of-resources theory of standing. As organizations, Plaintiffs cannot vote and have not alleged associational standing on behalf of any members. So the alleged irreparable harm to unrelated persons, to which these organizations pleaded no actual connection of any kind beyond mailing a postcard to some of them, offers a poor vehicle for injunctive relief from this Court. Plaintiffs cannot show any irreparable harm if the Court declines to enter injunctive relief at this stage.

## III.   The balance of equities does not favor Plaintiffs.

Plaintiffs wave away the equities by simply claiming that the Secretary will only face administrative inconveniences or no burden at all. Doc. No. [6-1], p. 26. But the equities do not favor Plaintiffs who waited too long to bring this challenge.

19

As the Court is aware, the State of Georgia is concluding an incredibly challenging election, with three separate counts of ballots and a runoff election looming. Absentee ballots were sent out by November 21, 2020. O.C.G.A. § 21-2-384(a)(2). The voter-registration deadline was yesterday, December 7, 2020. Early voting begins on December 14, 2020. O.C.G.A. § 21-2-385(d)(1).

It is unknowable at this point how many individuals Plaintiffs claim were wrongfully removed from the rolls have re-registered—Plaintiffs even admit that possibly all 22,896 individuals restored to the rolls a year ago may be included in their totals. It is also unknowable how many individuals Plaintiffs claim were wrongfully removed from the rolls actually had moved away and changed residences. Plaintiffs ask the Court to require Secretary of State staff to take time away from the administration of the January runoff to replace voters on the voter lists, none of whom are before the Court or who have offered a single declaration stating they were unable to vote.

Given the lack of evidence from Plaintiffs and the significant harm to the Secretary, Plaintiffs have not shown that the equities clearly favor the granting of an injunction.

## IV.   The public interest does not favor Plaintiffs.

Plaintiffs' proposed injunction is not in the public interest because of their lack of diligence. Litigation involving elections is unique because of the

interest in the orderly administration and integrity of the election process. *Purcell*, 549 U.S. at 4. As the Eleventh Circuit noted several weeks ago, "[t]he Supreme Court has 'repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election.'" *New Ga. Project*, 976 F.3d at 1284 (quoting *Repub. Natl. Comm.*, 140 S. Ct. as 1207). The risks of voter confusion and conflicting orders counsel against changing election rules, especially when there is little time to resolve factual disputes. *Id*.; *see also Purcell*, 549 U.S. at 5-6. To show they are entitled to a preliminary injunction, Plaintiffs must show they exercised reasonable diligence—something they cannot do. *Benisek*, 138 S. Ct. at 1944.

Even assuming everything Plaintiffs claim in their Motion is true, Plaintiffs admit they have known of the entirety of their analysis since November 2019—more than a year ago. Doc. No. [7] at ¶¶ 45, 55; Doc. No. [8] at ¶ 20. Counsel for Plaintiffs has written multiple letters, beginning two months ago, to the Secretary. Doc. No. [8] at ¶¶ 39, 43. Yet Plaintiffs inexplicably delayed in bringing this Complaint that now proceeds on an emergency basis—without the benefit of the full adversarial process designed by the Federal Rules of Civil Procedure—far too close to the election they seek to affect. Plaintiffs should not be rewarded for their lack of reasonable diligence in this case. *Reynolds*, 377 U.S. at 585; *Benisek*, 138 S. Ct. at 1944.

## CONCLUSION

This Court should deny the relief sought by Plaintiffs. They have not properly invoked this Court's jurisdiction because they did not provide pre-suit notice under the NVRA and because they do not have standing to raise their constitutional claims. They are not likely to succeed on the merits because Georgia uses Postal Service information as required by the NVRA and Plaintiffs have shown no requirement that non-Postal-Service information must be used when conducting list maintenance. The constitutional claim offers nothing more than this Court had before it a year ago on the same question in *Fair Fight Action*.

But even if there were jurisdiction and a likelihood of success, Plaintiffs have known the basis of this motion for more than a year. Considering the proximity to the election they seek to impact, the delay in bringing this case, and the Supreme Court's consistent direction about altering the rules of elections, the equities and public interest weigh heavily against granting injunctive relief.

Respectfully submitted this 8th day of December, 2020.

**STATE LAW DEPARTMENT**

Christopher M. Carr
Attorney General
GA Bar No. 112505

22

Bryan K. Webb
Deputy Attorney General
Georgia Bar No. 743580
Russell D. Willard
Senior Assistant Attorney General
Georgia Bar No. 760280
Charlene S. McGowan
Assistant Attorney General
Georgia Bar No. 697316
40 Capitol Square, S.W.
Atlanta, Georgia 30334


**TAYLOR ENGLISH DUMA LLP**

*/s/ Bryan P. Tyson*
Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411
btyson@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Loree Anne Paradise
Georgia Bar No. 382202
lparadise@taylorenglish.com
1600 Parkwood Circle, Suite 200
Atlanta, GA 30339
770.434.6868 (telephone)


*Counsel for Defendant Secretary of State*

## **CERTIFICATE OF COMPLIANCE**

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing DEFENDANT SECRETARY OF STATE'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION has been prepared in Century Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(B).

*/s/ Bryan P. Tyson*
Bryan P. Tyson