# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

BLACK VOTERS MATTER FUND,
TRANSFORMATIVE JUSTICE
COALITION, THE RAINBOW PUSH
COALITION, and SOUTHWEST
VOTER EDUCATION PROJECT,

    Plaintiffs,

v.

BRAD RAFFENSPERGER, in his official
capacity as Secretary of State of Georgia,

    Defendant.

REPUBLICAN NATIONAL
COMMITTEE and GEORGIA
REPUBLICAN PARTY,

    Intervenor-Defendants.

CIVIL ACTION FILE NO.

1:20-CV-04869-SCJ

## <u>ORDER</u>

This matter is before the Court on Plaintiffs' Motion for Preliminary Injunction (Doc. No. [6]). Defendant Secretary of State ("Defendant" or the "Secretary") opposes the Motion (Doc. No. [31]), as do Intervenor-Defendants

(Doc. No. [39]). The Court held an evidentiary hearing via videoconference on December 10, 2020. Doc. No. [51]. Following the hearing, the parties submitted supplemental briefing, which this Court has reviewed. Doc. Nos. [52]; [54]. The Court now rules as follows.[1]

## I.  **BACKGROUND**

The four named Plaintiffs in this civil action are: Black Voters Matter Fund ("BVMF"), Transformative Justice Coalition ("TJC"), Rainbow Push Coalition ("RPC"), and Southwest Voter Education Project ("SVEP"). Doc. No. [27]. BVMF is a non-partisan civic organization with a goal of increasing power in communities of color and maintaining core programs related to voting rights and access. Id. ¶ 1. TJC is a non-partisan 501(c)(3) organization that seeks to be a catalyst for transformative institutional changes to bring about justice and equality in the United States. Id. ¶ 2. TJC is involved in promoting voting rights through its "Democracy and Voting Rights Project." Id. RPC is a multi-racial, multi-issue, progressive, international membership organization that fights for

_____

[1] While Defendant has filed a Motion to Dismiss Complaint (Doc. No. [28]) and a Motion to Dismiss Amended Complaint (Doc. No. [35]), the Court makes no definitive ruling on said motions herein. The Court will allow the briefing process to run as to the operative pending complaint and motion.

social change. <u>Id.</u> ¶ 3. The RPC has a programmatic arm and an initiative related to voter registration. <u>Id.</u> SVEP "is an organization with a long history in assisting voters in education and registration." <u>Id.</u> ¶ 4.

Plaintiffs collectively filed this civil action on December 2, 2020 (Doc. No. [1]) and amended their complaint on December 8, 2020 (Doc. No. [27]). They bring statutory and constitutional claims, alleging Defendant unlawfully cancelled thousands of voters from Georgia's voter rolls. Doc. No. [27], pp. 1–5. More specifically, in Count I of their Amended Complaint, Plaintiffs allege that Defendant violated the National Voting Rights Act ("NVRA") by failing to use a United States Postal Service ("USPS") licensee to evaluate notice of change of address lists and removing registered voters from Georgia' voter rolls when they had not moved. <u>Id.</u> at 31. In Count II of their Amended Complaint, Plaintiffs allege that Defendant violated the NVRA's requirement to have accurate and current voter lists. <u>Id.</u> at 32. In Count III of their Amended Complaint, Plaintiffs allege that the State of Georgia's implementation of a "Use it or Lose It" process to remove voters from the voting rolls (as a proxy that a registrant has changed addresses) violates the Fourteenth Amendment to the United States Constitution. <u>Id.</u> at 33. The essence of Plaintiffs' factual claims arise from the investigation of

the Palast Investigative Fund and expert analysis, which concluded that a total of "199,908 Georgians [in 2019] had their [voter] registrations cancelled for allegedly moving, when, according to experts in the field, in all likelihood[,] they had not." Id. ¶¶ 18, 48, 50.

On December 3, 2020, Plaintiffs filed their Motion for Preliminary Injunction. Doc. No. [6]. Plaintiffs seek emergency injunctive relief and have asked this Court to order Defendant to place approximately 200,000 individuals (whose registrations were cancelled in 2019) back onto the voter rolls before the January 5, 2021 Senate runoff election. See Doc. No. [6], pp. 1, 3.

Defendant opposes Plaintiffs' Motion. Doc. No. [31]. Defendant argues that Plaintiffs lack organizational standing because they have failed to show that they diverted resources from their mission in response to Defendant's actions. Id. at 10. [2] Defendant also asserts that Plaintiffs have failed to establish the requirements for a preliminary injunction. Id. at 10–22.

---

[2] Defendant incorporates by reference the analysis for this and several other arguments from his Motion to Dismiss (Doc. No. [28]), which was revised (Doc. No. [35]) in response to Plaintiffs' First Amended Complaint (Doc. No. [27]).

Intervenor-Defendants also oppose Plaintiffs' Motion. Doc. No. [39]. They join Defendant's arguments (id. at 2) and emphasize two main points. First, they argue that the equities weigh against granting Plaintiffs' requested relief because they delayed too long in bringing this claim. Id. at 2–3. Second, they adopt Defendant's arguments in contending that Plaintiffs are unlikely to succeed on their statutory and constitutional claims. Id. at 4.

After full briefing and evidentiary hearing, this matter is now ripe for ruling.

## II.    LEGAL STANDARD

### A.    Organizational Standing

To bring a lawsuit in federal court, a plaintiff must have standing. Trichell v. Midland Credit Mgmt., Inc., 964 F.3d 990, 996 (11th Cir. 2020). To have standing, the plaintiff must show that it has suffered an injury in fact that has a causal connection to the defendant's conduct, and which the court likely can redress with a favorable decision. Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992); Trichell, 964 F.3d at 996 (stating that the party invoking a federal court's jurisdiction has the burden to establish standing). An organization may have standing under a "diversion-of-resources" theory when it must divert resources

to counteract a defendant's unlawful acts, thereby impairing the organization's ability to engage in its typical projects. Havens Realty Corp. v. Coleman, 455 U.S. 363, 379 (1982); Common Cause Ind. v. Lawson, 937 F.3d 944, 952–53 (7th Cir. 2019) (listing cases finding organizational standing for voter-advocacy groups that were forced to divert resources to counteract unlawful election activity).[3]

Under Eleventh Circuit law, a litigant can establish organizational standing to challenge election laws by showing it has or will have to divert time, personnel, or other resources from its usual projects to assist voters whose ability to vote is affected by State action. See Arcia v. Fla. Sec'y of State, 772 F.3d 1335, 1341 (11th Cir. 2014); Fla. State Conf. of NAACP v. Browning, 522 F.3d 1153, 1165–66 (11th Cir. 2008) (finding organizational standing when a plaintiff diverted resources from election-day education and monitoring to educating volunteers and voters on compliance with a new election law). Even when an organization diverts its resources to achieve its typical goal in simply a different

---

[3] Even if an organization arguably diverts its resources voluntarily, a court will find organizational standing if the "drain on [the] organization's resources arises from the organization's need to counteract the defendants' assertedly illegal practices [because] that drain is simply another manifestation of the injury to the organization's noneconomic goals." Fla. State Conf. of NAACP v. Browning, 522 F.3d 1153, 1166 (11th Cir. 2008) (internal quotations and citation omitted).

or amplified manner, the organization may still gain standing. <u>See</u> <u>Browning</u>, 522 F.3d at 1166 (finding organizational standing when a plaintiff anticipated that it would "expend many more hours than it otherwise would have" on specific election-related activity).

### B.    <u>Preliminary Injunction</u>

The Court considers four factors when deciding whether to issue a preliminary injunction pursuant to Federal Rule of Civil Procedure 65: (1) whether there is a substantial likelihood of success on the merits; (2) whether the preliminary injunction is necessary to prevent irreparable injury; (3) whether the threatened injury outweighs the harm that the preliminary injunction would cause to the non-movant; and (4) whether the preliminary injunction would be adverse to the public interest. <u>Parker v. State Bd. of Pardons & Paroles</u>, 275 F.3d 1032, 1034–35 (11th Cir. 2001). Injunctive relief is an extraordinary and drastic remedy and should not be granted unless the movant clearly establishes the burden of persuasion as to each of these four factors. <u>Siegel v. LePore</u>, 234 F.3d 1163, 1176 (11th Cir. 2000).

In addition, "[a]t the preliminary injunction stage, a district court may rely on affidavits and hearsay materials which would not be admissible evidence for

a permanent injunction, if the evidence is 'appropriate given the character and objectives of the injunctive proceeding.'" <u>Levi Strauss & Co. v. Sunrise Int'l Trading Inc.</u>, 51 F.3d 982, 985 (11th Cir. 1995). The decision to grant preliminary injunctive relief is within the broad discretion of the district court. <u>Majd–Pour v. Georgiana Cmty. Hosp., Inc.</u>, 724 F.2d 901, 902 (11th Cir. 1984).

### III. <u>ANALYSIS</u>

#### A. <u>Plaintiffs Have Organizational Standing</u>

Before addressing the merits of Plaintiffs' Motion for Preliminary Injunction, the Court must address whether Plaintiffs have Article III standing. <u>Caron Found. of Fla., Inc. v. City of Delray Beach</u>, 879 F. Supp. 2d 1353, 1363 (S.D. Fla. 2012). Plaintiffs assert that they have established organizational standing under a diversion-of-resources theory. Doc. No. [6-1], pp. 8–14. Each Plaintiff is an organization involved in civic engagement and that undertakes work in voting rights and voter education. <u>See</u> Doc. No. [27], ¶¶ 1–4

BVMF and its founder assert that it has diverted resources from its typical election-related programs, such as voter education and registration, to counteract the Secretary's alleged NVRA violations by spending thousands of dollars to send postcards to individuals erroneously cancelled from Georgia voter rolls. <u>Id.</u>

¶ 1; Doc. No. [44], ¶¶ 10–11. [4] TJC and its President assert that it diverted resources from its voting rights campaigns "to try to find those wrongfully removed from the voter rolls to try to get them re-registered." Doc. Nos. [27], ¶ 1; Doc. No. [43], ¶ 11. RPC and its Southeast Regional Director assert that RPC has expended resources in registering people to vote, that the Secretary's actions have caused RPC injury "by effectively nullifying decades of work in voter engagement and mobilization," and that RPC has had to divert resources from its usual projects to "ensur[e] registrants can remain on the voter rolls." Doc. Nos. [27], ¶ 3; [47], ¶ 14. And SVEP asserts that it has diverted resources from its planned projects to mobilize voters for the January 2021 runoff to restore voters who were erroneously cancelled from voter rolls. Doc. No. [27], ¶ 4. SVEP and its President explain that it has diverted resources by assigning a phone-banking team of twenty-five people to contact cancelled voters. Id.; Doc. No. [45], ¶¶ 10–

---

[4] Specifically, BVMF states that it diverted resources from its other core programs in order to have its 501(c)(3) entity, BVM Capacity Building Fund, send the postcards. Doc. No. [27], ¶ 1. Of course, if BVM Capacity Building Fund—an entity apparently under the BVMF organizational umbrella but which is not a party to this lawsuit—were the only entity to divert resources, then BVMF would not have diverted resources and thus likely would not have standing. But BVMF and its representatives have clearly asserted on the record that it diverted its financial resources "to have" BVM Capacity Building Fund send the postcards, and that it diverted non-monetary resources such as personnel and time to address the Secretary's actions.

14. Plaintiffs collectively assert that these diversions of resources suffice to establish standing in this case. Doc. No. [6-1], p. 14.

Defendant contends that Plaintiffs have failed to establish organizational standing. Doc. Nos. [35-1], pp. 3–13; [31], p. 1.[5] The Secretary argues that Plaintiffs have not adequately alleged concrete facts identifying exactly how or where the diversions occurred. See Doc. No. [35-1], pp. 5, 8. He also argues that because Plaintiffs' missions and projects already include voter registration and election-related activity, they cannot have diverted resources when they are pursuing their "already-existing goals and projects" and their new activities are simply "a continuation of [their] core mission." Id. at 5–8. Finally, the Secretary argues that related-but-separate organizations—and *not* Plaintiffs—actually incurred the alleged costs or diverted resources (see id. at 5–7) and that Plaintiffs fail to offer evidence in support of their alleged injuries (id. at 9).[6]

Defendant's arguments are unavailing. Plaintiffs have provided enough information to show the Court that they have diverted resources in response to

---

[5] Intervenor-Defendants did not separately argue standing but have adopted the Secretary's opposition. See Doc. No. [39], p. 2.

[6] Plaintiffs subsequently filed declarations of witnesses to establish evidence to support their diversion-of-resources argument. See Doc. Nos. [43]; [44]; [45]; [47].

10

the Secretary's actions. They identify projects they usually undertake—such as voter outreach, education, and mobilization—and allege that they have diverted resources to counteract Defendant's actions.[7] Further, the Court does not agree with Defendant's argument that Plaintiffs have not actually diverted resources since their alleged responses to Defendant's conduct were a continuation of their core missions. While Plaintiff indeed continued to pursue their core missions, they had to divert resources to pursue those missions in new ways. And this need for a new strategy was both unanticipated by Plaintiffs and in direct response to the Secretary's actions. The diversion-of-resources theory does not require a plaintiff to pursue an entirely new mission in order to gain standing; it simply requires the plaintiff to have diverted its resources to counteract the defendant's act, and that can include redirecting resources from one means of accomplishing

_____

[7] Some Plaintiffs have described the diversion more specifically than others. BVMF, for example, specified how much money it had to spend designing and mailing postcards it otherwise would not have mailed. And SVEP detailed how it diverted twenty-five people from working on typical election projects to calling people directly affected by the Secretary's actions. TJC and RPC, on the other hand, describe their typical election-related projects and assert more generally that they have diverted resources from those projects to contact or reregister voters. Through these allegations, supported by declarations and hearing testimony, the Court finds Plaintiffs have provided enough information to establish a diversion of resources.

a pre-existing goal to a different means of accomplishing that goal.[8] The Court thus finds that Plaintiffs have established organizational standing under a diversion-of-resources theory.

**B. Plaintiffs Have Not Demonstrated a Likelihood of Success on the Merits of their NVRA Claims or Constitutional Claims**

*1. NVRA Claims*

Plaintiffs assert claims under the NVRA, 52 U.S.C. § 20501, et seq. As discussed below, the Court finds that Plaintiffs (1) have failed to satisfy the NVRA's pre-suit notice requirement and (2) otherwise have not demonstrated a likelihood of success on the merits of their NVRA claims.

**a. Plaintiffs Lack Statutory Standing Under the NVRA**

The NVRA contains a civil enforcement provision that allows for a private right of action. 52 U.S.C. § 20510(b). Under that provision, "[a] person who is aggrieved by a violation of [the NVRA] may provide written notice of the

---

[8] To illustrate this point further, Defendant's theory would preclude an organization from establishing diversion-of-resources standing when trying to counteract actions that affect its express mission. That would effectively prevent organizations with arguably the greatest interest in a subject matter from being able to gain organizational standing to litigate issues affecting that subject matter. Clearly, organizational standing does not exist only to block parties with an express mission in an area from being able to litigate matters affecting that area. Defendant's theory is without merit.

violation to the chief election official of the State involved." Id. § 20510(b)(1)[9]; see also Pub. Interest Legal Found. v. Boockvar, 370 F. Supp. 3d 449, 457–58 (M.D. Pa. 2019) (declining to find that a chief election officer's alleged constructive notice of a violation satisfied the NVRA's notice requirement). The provision further provides that "[i]f the violation is not corrected within 90 days after receipt of [such] notice . . . *the aggrieved person* may bring a civil action in an appropriate district court for declaratory or injunctive relief with respect to the violation."[10] Id. § 20510(b)(2) (emphasis added); see also Bellitto v. Snipes, 221 F. Supp. 3d 1354, 1362–63 (S.D. Fla. 2016) (finding that an individual plaintiff lacked standing to sue under the NVRA when she failed personally to provide pre-suit notice, even when an organization of which she was a member provided pre-suit notice).

The notice provision is meant to give those violating the NVRA the chance "to attempt compliance with its mandates before facing litigation." Ga. State Conf.

---

[9] Although this provision uses permissive language, courts have read the pre-suit notice requirement to be mandatory. See Scott v. Schedler, 771 F.3d 831, 835 (5th Cir. 2014).

[10] This provision also creates a 20-day pre-suit notice period if the defendant's alleged violation occurs within 120 days of a federal election. 52 U.S.C. § 20510(b)(1). And it waives the notice period if the alleged violation occurs within 30 days of an election. Id. While a federal runoff election will occur within 34 days of the filing of the lawsuit, these provisions are inapplicable because the alleged violations occurred more than 120 days before the election will take place.

of NAACP v. Kemp, 841 F. Supp. 2d 1320, 1335 (N.D. Ga. 2012). Courts have found a notice adequate under this provision if it "(1) sets forth the reasons that a defendant purportedly failed to comply with the NVRA, and (2) clearly communicates that a person is asserting a violation of the NVRA and intends to commence litigation if the violation is not timely addressed." Boockvar, 370 F. Supp. 3d at 457.

Some courts have declined to enforce the notice requirement under a "futility" theory when the violating party clearly does not intend to comply with the NVRA absent litigation. See Ass'n of Cmty. Orgs. for Reform Now v. Miller, 129 F.3d 833, 838 (6th Cir. 1997). But if it is not clear that the allegedly violating party would refuse to comply with the NVRA absent litigation, courts will enforce the notice requirement. See Kemp, 841 F. Supp. at 1335 (declining to waive the notice requirement as to one plaintiff when the defendant had not received notice as to that plaintiff's specific injury).

Defendant argues that Plaintiffs lack statutory standing to bring their NVRA claims because they failed to provide pre-suit notice to Defendant as required under the NVRA's civil enforcement provision. Doc. No. [35-1], pp. 9–

13.[11] According to the Secretary, the two alleged "notice" events do not satisfy the NVRA's pre-suit notice requirements. Id. at 10–11. First, Defendant argues, the September 1, 2020 report by the ACLU of Georgia covering the cancellation of voters from Georgia voter rolls (the "ACLU Report") cannot qualify as notice by Plaintiffs because it was not directed[12] to the Secretary and was not authored by Plaintiffs. Id. at 11. Second, Defendant argues, while the September 22, 2020 letter sent to the Secretary did discuss voter roll issues, it cannot serve as the NVRA notice in this lawsuit due to two fatal flaws: (1) it was sent 71 days before the lawsuit was filed, so it does not meet the NVRA's 90-day requirement; and (2) the letter was not sent by or on behalf of Plaintiffs, and thus Plaintiffs are not the "aggrieved person[s]" as contemplated in the NVRA. Id. at 11–13.

Plaintiffs respond through their supplemental brief that the 90-day notice provision does not apply here because Plaintiffs brought their NVRA claims under 42 U.S.C. § 1983, which is not subject to the notice provision. Doc. No. [52],

---

[11] Intervenor-Defendants did not present arguments on this point and instead adopt Defendant's arguments. See Doc. No. [39], p. 2.

[12] The Court uses "direct" strictly to mean the report was not addressed to the Secretary in the same way a formal notice letter—such as the later notice letters others sent to the Secretary—would be.

pp. 2–4.[13] They also argue that Defendant was aware of the ACLU Report—as well as the publicly available list of cancelled voters—and thus had more than 90 days' notice of the issues underlying the lawsuit. Id. at 5–10. They further argue that formal 90-day notice would have been futile because the Secretary displayed his intention not to take corrective action when he (1) did not restore cancelled voters to the rolls after the ACLU Report was published and (2) did not respond to a letter from the author of that report seeking to meet with the Secretary to correct the alleged voter roll issues. See id. at 11–15. Finally, Plaintiffs argue they are "aggrieved parties" under the NVRA because they diverted resources in response to Defendant's actions. See id. at 15.

Defendant responds that superseding Supreme Court precedent does not permit expansive application of § 1983 as a means of bringing a statutory claim

_____

[13]  Plaintiffs requested during the December 10, 2020 hearing (Doc. No. [51]) to submit a response brief on the NVRA notice issue, which the Court in its discretion allowed. Plaintiffs filed their brief shortly after the hearing (Doc. No. [49]) but later filed a "corrected" brief that included testimony from the hearing (Doc. No. [52]). Because this "corrected" brief contained such testimony, the Court again exercised its discretion to allow Defendant and Defendant-Intervenors a chance to respond. Doc. No. [53]. Defendant responded. Doc. No. [54]. Plaintiffs then moved for leave to reply (Doc. No. [55]), which the Court denied (Doc. No. [56]). Thus, as to these filings, the Court considers only Plaintiffs' "corrected" brief (Doc. No. [52]) and Defendant's response (Doc. No. [54]).

when the underlying statute has its own, narrower remedial scheme. See Doc. No. [54], pp. 3–6. In this case, Defendant argues, the NVRA provides a specific statutory procedure for pursuing the narrow private right of action it grants, and the Court should not ignore its explicit 90-day notice provision simply because Plaintiffs bootstrapped a § 1983 workaround to their NVRA claim. See id. at 5–6. Defendant also reiterates that the ACLU Report does not constitute notice by an aggrieved party under the NVRA because it contained only a third party's generalized allegations. Id. at 6–8. Finally, Defendant argues that Plaintiffs failed to show that bringing notice would have been futile. Id. at 8–9.

After carefully considering the Parties' arguments, the Court finds that Plaintiffs failed to satisfy the NVRA's pre-suit notice requirement. That provision specifically requires an aggrieved party to give sufficiently detailed notice to a chief election officer of an NVRA violation. The aggrieved party who gives that notice may then file suit after 90 days if the chief election officer has not corrected the violation. Plaintiffs did not comply with these requirements.

First, the ACLU Report that Plaintiffs cite as giving constructive notice is inadequate for purposes of the pre-suit notice provision. That provision is in place to give parties an opportunity to identify and correct an alleged NVRA

violation before resorting to litigation. In order to fulfill the purpose of this provision, the aggrieved party that eventually files suit must be the party that provides the notice, and that notice must (1) give the chief election officer an opportunity to correct the issue and (2) signal the potential for litigation. While the ACLU Report may have shed light on the alleged NVRA issues underlying this lawsuit, such a report does not qualify as notice under the NVRA. It is not written notice sent "*to* the chief election officer" that would reasonably put the Secretary on notice that an NVRA lawsuit was looming.[14] Further, even if the ACLU Report could qualify as notice, no Plaintiff authored the report.[15] Because the notice provision grants the right to sue only to "***the***" aggrieved party that sent the notice, Plaintiffs do not qualify as the aggrieved party with the right to sue.[16]

---

[14] As indicated in Pub. Interest Legal Found. v. Boockvar, 370 F. Supp. 3d 449, 457–58 (M.D. Pa. 2019), such constructive notice typically does not suffice under the NVRA.

[15] Indeed, Plaintiffs do not even allege to be members of or have a formal affiliation with the ACLU of Georgia. That makes Plaintiffs even farther removed from the noticing party than the individual in Bellitto v. Snipes, 221 F. Supp. 3d 1354 (S.D. Fla. 2016), who was found not to have satisfied the notice provision despite being a member of an aggrieved party that had sent notice to the chief election officer in that case.

[16] Plaintiffs argue that they are aggrieved parties under the NVRA because they have standing under a diversion-of-resources theory. See Doc. No. [52], p. 15. While that may be true, it does not necessarily mean they satisfied the pre-suit notice requirement. That provision does not allow just any aggrieved party to sue after the chief election officer is put on notice; it allows only "***the*** aggrieved [party]" that sent the notice to sue. Even

Relatedly, the September 22, 2020 letter was (1) not sent by a Plaintiff and (2) was sent to the Secretary only 71 days before the lawsuit was filed. That letter thus does not support statutory standing for Plaintiffs under the NVRA. And while Defendant eventually did receive a letter that references one Plaintiff and arguably put the Secretary on formal notice of the alleged NVRA violation (see Doc. No. [8-2], pp. 3–4), that letter was sent October 19, 2020, only 44 days before Plaintiffs sued Defendant. Plaintiffs thus did not wait 90 days to sue as required under the NVRA.

Plaintiffs have also failed to demonstrate that providing notice would have been futile. The NVRA contains a notice provision to ensure that the chief election officer is directly informed of a violation and is incentivized by the threat of litigation to correct the violation. Defendant may not have responded to the ACLU Report, but he had no reason under the NVRA to do so because the report was not directly addressed to him and did not clearly forewarn him of litigation if he did not timely correct the violation. Any similar responses by the Secretary or his representatives to non-notice accusations that his office had violated the

---

if it could be said that the ACLU Report qualified as pre-suit notice—which the Court finds not to be the case—Plaintiffs are not *the* aggrieved parties that sent it.

NVRA similarly do not convince the Court that providing formal notice would have been futile. That is because such informal notices similarly would not have forced the Secretary to face either correcting the alleged violation or litigating over it.[17] And to the extent a Plaintiff or its counsel sent notices to which the Secretary did not respond, Plaintiffs did not wait the requisite 90 days to sue. The Court will not find futility when Plaintiffs sue after only a portion of the notice provision period has passed—to find futility in such a circumstance would paradoxically acknowledge the need to send notice while also arbitrarily shortening the notice time period. The Court will not adopt this approach.

Finally, the Court agrees with Defendant as to the § 1983 issue. While Plaintiffs cite cases supporting their proposition that § 1983 supports an NVRA claim that is not bound to the 90-day pre-suit notice requirement, the Supreme Court's decision in City of Rancho Palos Verdes v. Abrams, 544 U.S. 113 (2005)

---

[17] The Court understands that Defendant's apparent apathy towards the ACLU Report and third-party letters was not an encouraging sign for Plaintiffs. But that does not necessarily mean that providing pre-suit notice was futile. The report and letters did not present the Secretary with the proposition of either correcting the alleged violations or facing litigation, which is the pre-suit notice provision's carrot and stick. Further, the Secretary did not make the type of unequivocal statements that would convince this Court that he clearly would not correct the violations even when faced with the possibility of litigation.

supersedes those cases. Under that decision and caselaw stemming from it, § 1983 does not necessarily provide an avenue to vindicate rights under a federal statute if that statute has an express and specific remedial scheme. See id. at 119–21; Isabel v. Reagan, 394 F. Supp. 3d 966, 975–78 (D. Ariz. 2019). Because the NVRA expressly creates a right of action for its violation and provides a specific procedure to enforce that right, the Court finds that a party cannot use § 1983 to enforce the rights provided under the NVRA. See Isabel, 394 F. Supp. 3d at 977–78. Similarly, the Court finds that a party cannot invoke § 1983 to bypass the NVRA's procedural requirements. Thus, the Court finds that Plaintiffs cannot rely on § 1983 to avoid the NVRA's notice provision.

For the foregoing reasons, the Court finds that Plaintiffs failed to satisfy the NVRA's pre-suit notice requirement and thus at this time do not have statutory standing to sue under the NVRA. That finding notwithstanding, the Court will proceed to discuss the merits of Plaintiffs' claims.

### b.   Count I

The NVRA "requires state election officials to make a reasonable effort to remove certain ineligible registrants from the voter rolls." Bellitto v. Snipes, 935 F.3d 1192, 1194 (11th Cir. 2019). Under the NVRA, "the states . . . are required to

conduct a general program of list maintenance that makes a reasonable effort to remove voters who become ineligible on account of death or change of residence, and only on those two accounts." Id. at 1195; see also 52 U.S.C. § 20507(a)(4) ("[E]ach State shall . . . conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of--(A) the death of the registrant; or (B) a change in the residence of the registrant."). The NVRA provides the States with a safe harbor procedure "for conducting a general program of list maintenance that makes a reasonable effort to remove voters who become ineligible because of a change of address." Bellitto, 935 F.3d at 1203 (citations and quotations omitted). [18] Under § 20507(c)(1):

> (1) A State may meet the requirement of subsection (a)(4) by establishing a program under which--
> > (A) change-of-address information **supplied by the Postal Service through its licensees** is used to identify registrants whose addresses may have changed; and
> > (B) if it appears from **information provided by the Postal Service** that--
> > > (i) a registrant has moved to a different residence address in the same registrar's jurisdiction in which the registrant is currently registered, the registrar changes

---

[18] "In general, a safe harbor is a statutory provision 'that affords protection from liability or penalty.'" Bellitto, 935 F.3d at 1203 (citing Black's Law Dictionary (11th ed. 2019)).

the registration records to show the new address and sends the registrant a notice of the change by forwardable mail and a postage prepaid pre-addressed return form by which the registrant may verify or correct the address information; or

(ii) the registrant has moved to a different residence address not in the same registrar's jurisdiction, the registrar uses the notice procedure described in subsection (d)(2) to confirm the change of address.

52 U.S.C. § 20507(c)(1) (emphasis added).

"Because the information provided by the Postal Service is collected in the National Change of Address database, this process is known as the NCOA Process." Bellitto, 935 F.3d at 1204.

In Count I of Plaintiffs' Amended Complaint (and in their Motion for Preliminary Injunction), Plaintiffs allege that Defendant violated § 20507(c)(1) by failing to use a USPS licensee to identify registrants whose addresses may have changed. Doc. Nos. [6], pp. 15–17; [27], ¶ 85.

In opposition to Plaintiffs' motion for preliminary injunction, Defendant asserts that Plaintiffs do not show a likelihood of success on the merits because they have misread the requirements of the NVRA. Doc. No. [31], p. 11. Defendant asserts that the plain language of the NVRA "requires that the change-of-address

23

information be from the U.S. Postal Service, but does not require that the State use a particular type of licensee for this purpose." Id. at 11–12 (emphasis omitted).

The Court begins and ends its inquiry with the plain language of the statutory text, as the Court's "authority to interpret statutory language is constrained by the plain meaning of the statutory language in the context of the entire statute, as assisted by the canons of statutory construction." Edison v. Douberly, 604 F.3d 1307, 1310 (11th Cir. 2010) (citations omitted); see also Bellitto, 935 F.3d at 1200 ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.") (citations omitted). The Court does "not look at one word or term in isolation but rather look[s] to the entire statute and its context." Edison, 604 F.3d at 1310 (citations omitted). In addition, "[w]hen the words of a statute are unambiguous, then, this first canon [of statutory construction] is also the last: judicial inquiry is complete." CBS Inc. v. PrimeTime 24 Joint Venture, 245 F.3d 1217, 1222 (11th Cir. 2001) (citations and quotations omitted). This Court "must presume that Congress said what it meant and meant what it said." Id.

Here, the safe harbor provision of the NVRA is unambiguous, and context confirms that a plain reading of the statute should control. A plain reading of this provision is that a State shall establish a program under which "change-of-address information supplied by the Postal Service through its licensees is used to identify registrants whose addresses may have changed." 52 U.S.C. § 20507(c)(1). The plain language of the safe harbor provision does not require that a State hire a NCOALink Full Service Provider Licensee of the USPS and does not specifically prohibit use of a reseller or broker to obtain NCOA information.[19]

The evidence at the preliminary injunction hearing,[20] through the testimony and declaration of Chris Harvey, Director of Elections for the State of Georgia, showed that the Georgia vendor for NCOA information is Total Data Technologies, Inc. ("Total Data"). Doc. No. [31-1], ¶ 3. Total Data does not appear on the NCOALink Provider Licensees Lists published by the USPS; however, according to Mr. Harvey, the reports generated by Total Data "indicate that the

---

[19] NCOALink is a trademarked name appearing in the exhibits. See, e.g., Doc. No. [50-2].

[20] Due to the urgency attending Plaintiffs' emergency request for preliminary injunctive relief, the Court is issuing this Order before the transcript to the evidentiary hearing is available. Once the transcript is prepared, it will be filed in the docket.

database utilized for the NCOA process . . . comes from Anchor Computer." Doc. No. [31-1], ¶ 5; <u>see also</u> Doc. Nos. [50-2], [50-3].[21] Anchor Computer is listed as a full-service NCOALink provider licensee on the list published by the USPS. Doc. No. [50-2], p. 2. Mr. Harvey further stated that it was his understanding that Total Data "is a reseller or broker for Anchor Computer for NCOA services." Doc. No. [31-1], ¶ 6. In addition, Plaintiffs' NCOA list hygiene expert, John Lenser, testified that there are "many" merge houses (which the Court understands as resellers or brokers) in the NCOA data industry that have relationships with the eighteen full-service NCOALink licensees for processing of address records.[22]

As the evidence at the preliminary injunction hearing showed that Georgia's vendor, Total Data, utilized change-of-address information supplied by the USPS, through its licensee, Anchor Computers, there is evidence that Georgia's NCOA process meets the plain language of the NVRA safe harbor. Without more, Plaintiffs have not shown a likelihood of success on Count I of their Amended Complaint.

---

[21] There are only eighteen full-service NCOA Provider Licensees. Doc. No. [50-2]. There are over fifty NCOALink Limited Service Provider Licensees. Doc. No. [50-3].

[22] Postal list "hygiene" routines include "address standardization, zip code correction, NCOA and [Proprietary Change of Address Services] databases." Doc. No. [7], ¶¶ 21, 24.

c.    **Count II**

In Count II of their Amended Complaint, Plaintiffs allege that Defendant violated the NVRA's requirement to have accurate and current voter lists. Doc. No. [27], p. 32; see 52 U.S.C. § 20501(b)(4) (stating that one purpose of the NVRA "is to ensure that accurate and current voter registration rolls are maintained").

Plaintiffs have presented evidence, including expert testimony, tending to show that Defendant has cancelled voter registrations for individuals based in part on NCOA information when those individuals in fact have not moved. But as discussed above, Defendant has presented evidence indicating that Georgia relied on NCOA information supplied by the USPS to cancel voter registrations. Defendant also presented evidence that may account for the discrepancies between Plaintiffs' expert analysis and the NCOA list apparently used by Defendant in determining who may have moved. For example, at the hearing, Plaintiffs' expert John Lenser confirmed during cross-examination that the NCOA database is rolling, meaning new entries are periodically added and older entries are maintained for only 24 months. Doc. No. [51]. This means that lists pulled from the NCOA database at different times will include different names. Thus, the information Georgia used to conduct list maintenance may have

included names that Plaintiffs' experts later would not have been able to identify as on the NCOA database because those names had rolled off the NCOA database by the time the experts conducted their analysis.

Ultimately, Plaintiffs and Defendant have both presented evidence tending to support their respective arguments. After considering this evidence, the Court finds that Plaintiffs have not "clearly established" their burden of persuasion as to the likelihood of success of their claim under Count II of their Amended Complaint so as to warrant the extraordinary and drastic remedy of injunctive relief.

### 2. *Constitutional Claims*

Plaintiffs claim that Georgia's list maintenance process, and specifically the no-contact provision, violates the Equal Protection Clause.[23] This is because no contact, as applied, "creat[es] distinctions in the law which are wrong more the half the time disenfranchising infrequent voters." Doc. No. [27], ¶ 102. Plaintiffs also note that plaintiffs in a related action, <u>Fair Fight Action et al v. Raffensperger et al</u>, 1:18-cv-05391-SCJ, have also challenged the no-contact scheme under the

---

[23] Plaintiffs refer to this provision as "Use It or Lose It." For the sake of consistency, this Order uses the term "no contact," as it has in related litigation. This is not to comment on the accuracy of either term.

First Amendment, though it is unclear if Plaintiffs here bring the same challenge. See id. ¶¶ 103–04.

"The right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise." Bush v. Gore, 531 U.S. 98, 104 (2000); see also Dunn v. Blumstein, 405 U.S. 330, 336 (1972) (noting the Supreme Court "has made clear that a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction"). "[O]nce the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment." Bush, 531 U.S. at 105 (quoting Harper v. Va. Bd. of Elections, 383 U.S. 663, 665 (1966)). Thus, each State is constitutionally obligated "to avoid arbitrary and disparate treatment of the members of its electorate." Id. This equal right to vote, however, "is not absolute; the States have the power to impose voter qualifications, and to regulate access to the franchise in other ways." Dunn, 405 U.S. at 336; see also Burdick v. Takushi, 504 U.S. 428, 433 (1992) ("It does not follow, however, that the right to vote in any manner and the right to associate for political purposes through the ballot are absolute.").

Plaintiffs have shown that Georgia's list maintenance process may not be accurate in identifying voters who have actually moved. But they have not shown, or even alleged, that the process is applied differently to any class of voters. Unlike in Bush, where there was evidence that "standards for accepting or rejecting contested ballots might vary not only from county to county but indeed within a single county from one recount team to another," 531 U.S. at 106, here, there is no evidence at this stage that the list maintenance process is not uniformly applied.[24]

---

[24] Plaintiffs argue that "infrequent voters are treated differently" under Georgia's list maintenance scheme. Doc. No. [6-1], p. 35. The Court will assume, for the sake of argument, that this is a cognizable Equal Protection claim. However, Georgia's no-contact provision and its treatment of "infrequent voters" mirrors the safe harbor process set forth in the NVRA as one that States "may" use to identify voters who have moved. See 52 U.S.C. § 20507(b)(2) (stating that States may remove an individual who "(A) has not either notified the applicable registrar (in person or in writing) or responded during the period described in subparagraph (B) to the notice sent by the applicable registrar; and then (B) has not voted or appeared to vote in 2 or more consecutive general elections for Federal office"); § 20507(d)(1)–(2) (describing the no-contact removal process); see also Husted v. Randolph Inst., ___ U.S. ___, 138 S.Ct. 1833, 1843 (2018) (upholding Ohio's list maintenance process—almost identical to Georgia's—as compliant with the NVRA's requirements). Thus, if Georgia's list maintenance process is unconstitutional, so too is the safe harbor process outlined in the NVRA. The Court is not prepared to make such a finding, even preliminarily, on this record.

Because there is no evidence at this time that the list maintenance process is not uniformly applied to Georgia's list of registered voters, the Court agrees with Defendant that the proper framework for analyzing Plaintiffs' Fourteenth Amendment claim is the Anderson-Burdick framework.[25] "The Supreme Court has rejected a litmus-paper test for constitutional challenges to specific provisions of a State's election laws and instead has applied a flexible standard." Common Cause/Georgia v. Billups, 554 F.3d 1340, 1351 (11th Cir. 2009) (internal quotation marks omitted). Thus, the reviewing court must first "consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate." Anderson v. Celebrezze, 460 U.S. 780, 789 (1983). A court must then "identify and evaluate the interests put forward by the State as justifications for the burden imposed by its rule." Id. "Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional." Id.; see also Burdick, 504 U.S. at 434.

---

[25] Anderson-Burdick would also apply to any First Amendment claim. See Anderson v. Celebrezze, 460 U.S. 780, 789 (1983).

If a State's election law imposes only "reasonable, nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of voters, "the State's important regulatory interests are generally sufficient to justify" the restrictions. Burdick, 504 U.S. at 434 (citing Anderson, 460 U.S. at 788). But if a State's election law imposes a "severe" burden, it must be "narrowly drawn to advance a state interest of compelling importance." Id. (citing Norman v. Reed, 502 U.S. 279, 289 (1992)). In other words, "lesser burdens . . . trigger less exacting review." Timmons v. Twin Cities Area New Party, 520 U.S. 351, 358 (1997).

In December of 2019, this Court applied the Anderson-Burdick framework to Georgia's list maintenance process in the related Fair Fight case. See Fair Fight Action et al v. Raffensperger et al, 1:18-cv-05391-SCJ, ECF No. [188] (N.D. Ga. Dec. 27, 2019) (Order Denying Motion for Preliminary Injunction). It is uncontested that the process has not changed since. Thus, the same analysis applies:

> At this time, there is no evidence that any . . . voters were burdened or precluded from returning the two confirmation notices, which are prepaid and preaddressed Additionally, there is no evidence at this time that any of the four voters are precluded or burdened by registering to vote again. In fact, at the preliminary injunction hearing, Mr. Harvey testified that re-registering to vote after being removed from the voter rolls for "no contact" is no different from registering to vote in the first instance. A voter can re-

32

register to vote by going online to use the Online Vote
Registration system or renewing one's driver's license
or identification car with the Department of Driver
Services.

Id. at 26–27 (internal citations omitted). And unlike in Fair Fight, where

individual voter declarations were in evidence, Plaintiffs here have not submitted

evidence that any individual voter was burdened by the process.

It is true that, because Georgia does not permit same-day registration, any

voter whose registration was cancelled and who did not re-register will not be

permitted to vote in the January 5, 2021 run-off election. However, Plaintiffs have

not shown that a single voter was prevented from re-registering before the

deadline on December 7, 2020. In fact, the testimony at the evidentiary hearing

established that many of the individuals on the 2019 cancelled registration list

have re-registered to vote due to outreach efforts. Therefore, the Court finds

Plaintiffs have not shown a substantial likelihood of success in establishing that

the burden imposed by the no-contact scheme (i.e., returning a prepaid,

preaddressed confirmation notice or re-registering to voter) is severe.

On the other side of the balancing analysis is the State's purported interests

in enforcing the no-contact provision. Because the burden is "slight," the state

interest need not be "compelling . . . to tip the constitutional scales in its direction."

<u>Burdick</u>, 504 U.S. at 439. Rather, "the State's important regulatory interests are generally sufficient to justify" the restrictions. <u>Id.</u> at 434. In <u>Fair Fight</u>, this Court found that the regulatory interests of the State in (1) maintaining a reliable list of electors, (2) applying election laws as written, and (3) eliminating voter confusion and improving election-day operations were sufficient to satisfy <u>Anderson-Burdick</u>. 1:18-cv-05391-SCJ, ECF No. [188], pp. 28–29.

Finally, the Court declines to enter any injunctive relief on Plaintiffs' constitutional claim as it was not timely brought. To show they are entitled to a preliminary injunction, Plaintiffs must show they exercised "reasonable diligence." <u>Benisek v. Lamone</u>, ___ U.S. ___, 138 S. Ct. 1942, 1944 (2018) (citation omitted). "That is as true in election law cases as elsewhere." <u>Id.</u> (citing <u>Lucas v. Townsend</u>, 486 U.S. 1301, 1305 (1988) (Kennedy, J., in chambers); <u>Fishman v. Schaffer</u>, 429 U.S. 1325, 1330 (1976) (Marshall, J., in chambers)). Unlike Plaintiffs' § 1983/NVRA claims, which were precipitated by the September ACLU Report, the claim that Georgia's list maintenance process is unconstitutional is not new — this Court has been addressing that claim since 2018 in the <u>Fair Fight</u> litigation. The Court sees no reason why Plaintiffs waited until December of 2020 to bring their broader constitutional claims.

### C. Plaintiffs Have Not Demonstrated They Will Suffer Irreparable Harm Absent the Preliminary Injunction

Plaintiffs argue they will suffer irreparable harm absent injunctive relief because Georgia voters cancelled from the voter rolls will lose their ability to vote in the January 2021 runoff election. Doc. No. [6-1], pp. 24–26. Defendant counters that Plaintiffs' argument fails because they are proceeding under a diversion-of-resources theory of standing and have not shown that they or even their members are directly affected. See Doc. No. 31, pp. 18–19. Thus, Defendant reasons, only third persons unrelated to Plaintiffs, and not Plaintiffs themselves, will suffer irreparable harm. Id. at 19.

The Court finds that Plaintiffs have not shown they will suffer irreparable harm absent injunctive relief. Plaintiffs are correct to note that a restriction on an individual's right to vote often constitutes an irreparable injury. See League of Women Voters of Fla. v. Browning, 863 F. Supp. 2d 1155, 1167 (N.D. Fla. 2012). But Plaintiffs fail to show how irreparable injury to these voters will irreparably harm *Plaintiffs*. Had they alleged that their members would suffer this irreparable harm, they may have been able to show that they too would suffer irreparable harm. See U.S. Student Ass'n Found. v. Land, 585 F. Supp. 2d 925, 944 (E.D. Mich. 2008). Plaintiffs, however, are not proceeding under an associational theory but

instead under a diversion-of-resources theory and thus have only a tenuous connection to the cancelled voters. The Court cannot find from the record that the injuries of these voters necessarily constitute irreparable harm to Plaintiffs.[26]

### D. The Burden to the Non-Movants Outweighs the Threatened Harm

The Court finds that if it were to grant the injunction, the burden to Defendant would outweigh the threatened injury to Plaintiffs. Defendant argues that "Plaintiffs ask the Court to require Secretary of State staff to take time away from the administration of the January runoff to replace voters on the voter lists, none of whom are before the Court or who have offered a single declaration stating they were unable to vote." Doc. No. [31], p. 20.

As the Eleventh Circuit noted several weeks ago, "[t]he Supreme Court has 'repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election.'" New Ga. Project v. Raffensperger, 976

---

[26] The Court notes that voting-rights organizations have been found to have suffered an irreparable harm distinct from that of individual voters if the organizations' missions would continue to be frustrated absent injunctive relief. See, e.g., Georgia Coal. for People's Agenda, Inc. v. Kemp, 347 F. Supp. 3d 1251, 1268 (N.D. Ga. 2018); Project Vote, Inc. v. Kemp, 208 F. Supp. 3d 1320, 1350 (N.D. Ga. 2016); Action NC v. Strach, 216 F. Supp. 3d 597, 642 (M.D.N.C. 2016); League of Women Voters of Fla. v. Cobb, 447 F.Supp.2d 1314, 1339 (S.D. Fla. 2006). But even if such an argument could apply here, Plaintiffs did not make it. Because they bear the burden on their Motion for Preliminary Injunction, the Court will heed only the arguments they presented.

F.3d 1278, 1284 (11th Cir. 2020) (quoting <u>Republican Nat'l Comm. v. Democratic Nat'l Comm.</u>, 140 S. Ct. 1205, 1207 (2020)). Absentee ballots for the January runoff were sent out by November 21, 2020. O.C.G.A. § 21-2-384(a)(2). The voter-registration deadline was December 7, 2020. Early voting begins on December 14, 2020. O.C.G.A. § 21-2-385(d)(1). Where, as here, ballots are "already printed and mailed," an injunction would "violate <u>Purcell</u>'s well-known caution against federal courts mandating new election rules—especially at the last minute." <u>Id.</u> at 1283 (citing <u>Purcell v. Gonzalez</u>, 549 U.S. 1, 4–5 (2006)). At this stage, requiring Defendant to (1) go through the list provided by Plaintiffs and attempt to determine which voters, if any, were improperly removed; (2) determine whether any improperly removed voters have already re-registered; and (3) restore removed voters who have not re-registered to active status[27]—all before January 5, 2021—would impose a severe burden.

_____

[27] In <u>Fair Fight</u>, this Court noted that the Secretary of State could restore a cancelled voter registration to active status within twenty-four to forty-eight hours. <u>See</u> <u>Fair Fight Action et al v. Raffensperger et al</u>, 1:18-cv-05391-SCJ, ECF No. [164], p. 2 (N.D. Ga. Dec. 16, 2019). However, we are now at a very different juncture. In December of 2019, the list maintenance was about to occur—and any erroneously cancelled registrant could be quickly reinstated because there was no concern that they might re-register on their own in the interim. Now, a year has passed since the affected registrations were cancelled, and the evidence at the preliminary injunction hearing established that due to some of the cancelled voters having re-registered, there is now the potential problem

**E.** **The Preliminary Injunction Sought Has the Potential to Cause Confusion on the Eve of an Election, Harming the Public Interest**

The Court finds that the requested relief poses a significant risk of confusion. As Defendants note, "[i]t is unknowable at this point how many individuals Plaintiffs claim were wrongfully removed from the rolls have re-registered—Plaintiffs even admit that possibly all 22,896 individuals restored to the rolls a year ago may be included in their totals." Doc. No. [31], p. 20. Plaintiffs acknowledge that they do not know how many people on their list of cancelled registrations may have re-registered before December 7, 2020. Doc. No. [51]. Thus, the risk of dual registrations and voter confusion is high. "Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." New Ga. Project, 976 F.3d at 1284 (quoting Purcell, 549 U.S. at 4). The Court concludes that ordering injunctive relief which may affect the accuracy of Georgia's voter rolls during an election is not in the public's interest.

---

of "dual registrations," i.e., a previously cancelled voter being on the rolls in two separate counties (the county of their original registration and the county of their new registration). In essence, restoring individual registrants to active status will require significantly more research and time to ensure that the voter is registered and on the roll in only one county.

## IV.    **CONCLUSION**

For the foregoing reasons, the Court **DENIES** Plaintiffs' Motion for Preliminary Injunction (Doc. No. [6]). However, the Court acknowledges that there may be discrepancies in the NCOA information provided by Plaintiffs' experts and the records Georgia used to cancel voter registrations in December of 2019. It therefore strongly encourages the Parties to meet and determine the explanation, if any, for the alleged inaccuracies.

**IT IS SO ORDERED** this  16th  day of December, 2020.


s/Steve C. Jones
_____
**HONORABLE STEVE C. JONES**
**UNITED STATES DISTRICT JUDGE**